FRED R. SCROGGINS v. CITY OF HARLINGEN.

No. 7260. Decided February 9, 1938.
Rehearing overruled March 30, 1938.
(112 S. W., 2d Series. 1035; 114 S. W., 2d Series, 853.)

238

*Carter & Stiernberg* and *A. J. Rabel,* all of Harlingen, for plaintiff in error.

A Home-rule city, which is authorized by its charter to own public parks and playgrounds and provide amusements therein, is not acting beyond its corporate powers when it permits a riding device or swing, known as a "Merry Mix-up", to operate in its park when such device is intended to and does provide exercise, amusement and recreation to the public using the same. City of Waco v. Branch, 117 Texas 394, 5 S. W. (2d) 498; Fort Worth v. Wiggins, 5 S. W. (2d) 761; Sifford v. Water Works Board of Trustees, 70 S. W. (2d) 476.

*Polk Hornaday & Arthur Klein,* of Harlingen, for defendant in error.

The undertaking of the staging of a Valley Midwinter Fair and the contracting with a carnival company for amusement devices during said fair in a city park by the secretary of a municipally operated Chamber of Commerce in the absence of a specific charter provision and authority, is ultra vires, and a home rule city was not responsible to the patrons of the carnival for injuries resulting from defective amusement device. Foster v. City of Waco, 113 Texas 352, 255 S. W. 1104; Tharp v. Blake, 171 S. W. 549; 31 Tex. Jur. 1330.

MR. JUSTICE SHARP delivered the opinion of the Court.

The sole question presented in this case involves the liability of a municipal corporation for injuries sustained by a person by reason of the defective condition of an amusement device operated for profit in a public park owned by such municipal corporation.

Fred R. Scroggins brought this suit against the City of Harlingen and a group of other defendants, designated herein as the Carnival Company, for injuries received by him when he was riding on an amusement device known as the "Merry Mix-up," being operated by the Carnival Company on a City-owned park as a part of the annual midwinter fair, which Scroggins claims was conducted by the City through the agency or instrumentality of its chamber of commerce and the latter's secretary, and alleged to have been supported by the City. Scroggins recovered judgment for $10,000 against the defendants. The City of Harlingen alone appealed to the Court of Civil Appeals at San Antonio, and the judgment of the trial court was reversed and the cause remanded, because that court held that the acts of the city officials were ultra vires and the City of Harlingen was not responsible therefor. 101 S. W. (2d)

632. This Court granted a writ of error on the application of Scroggins.

It is contended that the Court of Civil Appeals erred in holding that the undertaking described in plaintiff's petition was beyond any authority found in the home rule charter of the City of Harlingen, and in holding that the trial court erred in not sustaining a general demurrer to such petition, on the ground that the acts of the City officials were ultra vires and the City should not be held liable for their acts.

This record is very voluminous. The Court of Civil Appeals in its opinion sets out in detail the substance of the pleadings, and we refer to such opinion for a more detailed statement of the general nature of this case. We shall state, however, such facts and pleadings as are pertinent to a decision of the question before us. The Court of Civil Appeals in its opinion clearly stated the issues presented and the findings of the jury. We adopt from the opinion the following statement:

"Prior to 1927 about 47 acres of land were owned by a private corporation known as the 'Valley Mid-Winter Fair Association' which operated an annual midwinter, or December, fair on such grounds to advertise the citrus, vegetables, and other products of the Magic Valley. In 1927 the City purchased the 47 acres in question for a park, and thereafter maintained said park throughout the year, having thereon a large auditorium and a large grandstand to seat patrons witnessing horse races and auto races and rodeos, and a large exhibit building in which to exhibit the products of the Magic Valley during its fair, and an office building and a zoo, tennis courts, picnic grounds and playgrounds for children with such amusement devices as swings, seesaws, slides, and merry-go-rounds. This park, with its many advantages, was open to the public without charge throughout the year except that during one week in the winter a fair was conducted to advertise the products of the Magic Valley, and during such week no charge was made for admission to the main gates of the park, except that a charge of 25 cents was made for the entry of each automobile, and except that charges were made by various concessionaires, such as the concessionaire who operated the rodeo and the concessionaire who operated the carnival. The 25 cents admission charged for each car was collected and retained by the chamber of commerce and a part of the gate receipts for entry to the grandstand to witness the rodeo went to the chamber of commerce. A charge of 10 cents was made to enter the main carnival grounds and another charge of 10 cents was made to ride on the Merry Mix-up, and both of these dimes were divided

on a percentage basis between the carnival and the chamber of commerce. Space was let to various private concerns for putting on exhibits and amusements, and charges were made for such purposes by the chamber of commerce. All of these funds collected by the chamber of commerce went into a common pot and were used to pay for the prizes that were awarded for exhibits during the fair and for expenses of operating the fair and for making permanent improvements upon the City's fair park.

"As stated above, the Valley Mid-Winter Fair Association, a private corporation, sold the park or fairgrounds to the City in 1927, but operated the fair for the next year, 1928, on the City's fairgrounds at a loss. It then forfeited its charter and went out of existence. In 1929 the chamber of commerce voted to take over the operation of the fair and did operate the fair through its secretary each year thereafter without formal action on its part, except that no fair was held during the hurricane year of 1933. The mayor, members of the city commission, and members of the chamber of commerce all understood that it was the duty of the secretary of the chamber of commerce to put on the fair and knew that he did so each year and, in fact, it was common knowledge in the City that the City was putting on the annual fair, and his acts in putting on the fair and his general manner of handling the same was known to, acquiesced in and consented to by the mayor, and the members of the city commission and chamber of commerce, and, in general, by the entire city's population.

"While the city council apparently took no formal action to turn the park over to the chamber of commerce for use during the fair week, yet by a common consent of the mayor and the city commission the fairgrounds park was turned over to the chamber of commerce for the purpose of holding the fair during fair week. Apparently the chamber of commerce took no formal action instructing its secretary to put on the annual fair, but it was understood by the members of the chamber of commerce that the duties of the secretary, for which he was being paid out of money furnished to the chamber of commerce by the City, included the duty of putting on the annual fair, and that this was perhaps the major annual activity of the chamber of commerce.

"While such fair was in progress, Fred R. Scroggins, his wife and little boy, entered the main gates of the fairgrounds, went into that part of the fairgrounds blocked off for use by the carnival and paid a dime each for admission to such part

of the fairgrounds, and Mr. Scroggins and his son each bought a ticket to ride on the 'Merry Mix-up,' one of the amusement devices which was drawing the large crowds to the fair, and such amusement device went to pieces because of its defective condition and caused the injuries which resulted in this lawsuit, and the evidence showed, and the jury found, that the 'Merry Mix-up' was not in a reasonably safe condition, and that an inspection would have disclosed its defects, and that the mayor and the city commission and the chamber of commerce, and all of their subordinates, wholly failed to make any inspection to see whether it was fit for use by the public who were permitted and, we think, impliedly invited, by the City to use the same.

"The plaintiff in his petition set out the nature of the City and its government, and its charter provisions authorizing it to (1) purchase land for corporate purposes; (2) operate public service utilities and demand and receive compensation for same; (3) have exclusive control over all city parks and playgrounds and provide for amusements therein, erect buildings, establish walks and driveways through said parks and playgrounds, etc.; (4) enact all ordinances and resolutions, and constitute the governing body of the City; (5) authorizing the mayor, with the advice and consent of the city commission, to appoint all appointive offices; and its charter provisions provided for the establishment and maintenance of a chamber of commerce and for taxes to support the same, and set out the creation of the chamber of commerce and the election of A. L. Brooks as secretary and manager of said chamber of commerce for the year 1934, his duties, including his duty to put on the fair, and the substance of the contract which he made with the Carnival Company whereby he, for and in behalf of the chamber of commerce, would receive 25 per cent. of the shows and riding device receipts, and $20 for each concession operated, and 33-1/3 per cent. of the gate receipts charged for admission to the carnival grounds, and whereby he agreed with the Carnival Company 'to work hand in hand to make the Fair an artistic and financial success.' Plaintiff alleged that on January 10, 1930, the chamber of commerce adopted a motion to take over the management of the annual fair, and it did, through its secretary, manage such fair each year from 1930 to 1934, inclusive, except for the year 1933, when no fair was held on account of the hurricane, and that the funds received by the chamber of commerce and its secretary were used to pay for labor and material in making repairs to the buildings and other permanent improvements on the city's fairgrounds, and that his actions were known to, acquiesced in and consented to by

the mayor, the members of the city commission and the chamber of commerce; that the City levied and collected a tax to support the chamber of commerce and allotted large sums of money each year to the chamber of commerce to pay its secretary for conducting the fair and for other purposes, and that the chamber of commerce in putting on the fair was devoting its time to the growth, advertisement, development, improvement, and increase of taxable values of said City, same being the purpose specified in the charter for which the chamber of commerce was created."

Plaintiff alleged that there was received from the carnival and rodeo operated in connection with the fair a net profit of $2346.74 for the week during which the fair was operated in December, 1934, when plaintiff was injured, and that a part of the profits from the operation of said carnival and rodeo was used to pay for labor and materials for repairing and making permanent improvements by the City on its fairgrounds, and that the operation of said fair was the major operation of the City's chamber of commerce.

The case was submitted to the jury on special issues. The evidence raised many issues of fact, which were submitted to the jury by the court. The Court of Civil Appeals has summarized the findings of the jury as follows:

"The jury found that the defendants (1) failed to maintain the riding device in a reasonably safe condition; (2) failed to have the outside upper beams of the riding device securely attached; (3) failed to have the beam to which the riding device in which plaintiff was seated was attached, maintained at sufficient strength; (4) failed to have the car in which plaintiff was riding properly attached to the other equipment; and that such failure in each instance constituted negligence and that such negligence in each case was the proximate cause of the injuries to plaintiff.

"The jury further found: (1) That a reasonable inspection would have disclosed all of the defects in said riding device found by the jury to exist; (2) that the mayor and a majority of the members of the city commission and a majority of the members of the chamber of commerce knew that the riding device or 'Mix-up,' on which plaintiff was injured, was being operated on the fairgrounds prior to the time of the injury and acquiesced in and consented to such operation.

"The jury then found that the City of Harlingen, its officers, agents, and employees failed to make a reasonable inspection

before the time of the injuries in question of the riding device, or 'Mix-up,' on which plaintiff was injured, to determine whether such riding device, or 'Mix-up,' was safe for persons to ride thereon, and that such failure was negligence and that such negligence was the proximate cause of plaintiff's injuries, and a special issue found the same thing as to the Carnival Company.

"The jury further found that the mayor, and a majority of the city commission, when allotting money for the operation of the Harlingen Chamber of Commerce for the year 1934, understood that such chamber of commerce would arrange for the holding of a fair during the winter season of 1934 on the fairgrounds belonging to the City, and found that A. L. Brooks (secretary of the chamber of commerce) and a majority of the members of the chamber of commerce understood when the said A. L. Brooks was employed as secretary thereof that his duties included making arrangements for holding a fair on the Harlingen fairgrounds during the winter season of 1934, and the letting of all concessions on the fairgrounds during the operation of said fair, and that the said A. L. Brooks, in making the agreement for the operation of the carnival in question, was acting in the performance of duties which he considered himself obligated to perform under his contract of employment with the chamber of commerce, and that a majority of the members of the chamber of commerce understood that the said A. L. Brooks was acting in the performance of his duties, which he was obligated to perform for the salary which the chamber of commerce was paying him, when he made the agreement for the operation of the carnival in question.

"The jury further found that the substance of the agreement made by Brooks for the operation of the carnival was known to, and acquiesced in, by a majority of the members of the chamber of commerce, and by the mayor and a majority of its city commissioners.

"The jury further found that some of the money taken in by the secretary of the chamber of commerce from the operation of its annual fair on the Harlingen fairgrounds during the years 1930 to 1934, was used in making improvements on property belonging to the city, and that the mayor and a majority of the city commission knew and acquiesced in the action of the secretary of the chamber of commerce in using such monies in making improvements on the property belonging to the City.

"The jury found that the holding of the annual fairs for the years 1930, 1931, 1932, and 1934, was conducive to the 'growth,

advertisement, development, improvement and increase of taxable values of said city,' this being the purpose for which the chamber of commerce was created under the City's charter.

"The jury found against defendants on the issue of contributory negligence and unavoidable accident, and found plaintiff's damages to be $10,000, and judgment was rendered for this sum."

The decisions pertaining to the liability of cities for operating parks are in conflict. In many jurisdictions it is held that if a city equips its parks with devices for recreation and exercise, for the use of its inhabitants, it is liable for damages for injuries sustained in their use because of their negligent construction or maintenance. City of Denver v. Spencer, 34 Colo. 270, 2 L. R. A. (N. S.) 147, 114 Am. St. Rep. 158, 82 Pac. 590, 7 Ann. Cas. 1042, 19 Am. Neg. Rep. 94; Pennell v. Wilmington, 7 Pennewill (Del.) 229, 78 Atl. 915; City of Anadarko v. Swain, 42 Okla. 741, 142 Pac. 1104; Weber v. Harrisburg, 216 Pa. 117, 64 Atl. 905; Warden v. City of Grafton, 99 W. Va. 249, 128 S. E. 375, 42 A. L. R. 259. Also, many decisions can be cited holding a city not liable for such acts. Harper v. Topeka, 92 Kan. 11, 51 L. R. A. (N. S.) 1032, 139 Pac. 1018; Board of Park Comrs. v. Prinz, 127 Ky. 460, 105 S. W. 948; Bolster v. Lawrence, 225 Mass. 387, L. R. A. 1917B, 1285, 114 N. E. 722; Heino v. Grand Rapids, 202 Mich. 363, L. R. A. 1918F, 528, 168 N. W. 512; Bisbing v. Asbury Park, 80 N. J. L. 416, 33 L. R. A. (N. S.) 523, 78 Atl. 196; Blair v. Granger, 24 R. I. 17, 51 Atl. 1042; Nashville v. Burns, 131 Tenn. 281, L. R. A. 1915D, 1108, 174 S. W. 1111; Bernstein v. Milwaukee, 158 Wis. 576, L. R. A. 1915C, 435, 149 N. W. 382, 8 N. C. C. A. 624.

We need not stop to inquire for the reasons adduced by the courts of other states for their decisions, for we can base the decision in this case on the provisions of the Constitution and the articles of the statutes under which the City of Harlingen operates.

The statutes delegate certain broad powers to a city operating under the Home Rule Amendment. It is undisputed that the City of Harlingen operated under the Home Rule Amendment, having adopted a special charter under the provisions of Article XI, Section 5, of the Constitution of Texas, and Title 28, Chapter 13, Article 1165 et seq., Vernon's Annotated Civil Statutes. In Section 5, Article XI, it is provided that said cities "may levy, assess and collect such taxes as may be authorized by law or by their charters." Article 1175 embraces the powers delegated to a city operating under the Home Rule Amendment.

Subdivision 15 of Article 1175 authorizes a city to own public parks and playgrounds, and to provide amusements therein.

The City charter, among other things, provides:

"The City of Harlingen . . . may take, hold and purchase land within or without the city limits, as may be needed for the corporate purposes of said city." (Article 2, Section 1, of the charter.)

"The City shall have exclusive control over all city parks and playgrounds and to provide amusements therein." (Article 2, Section 21, of the charter.)

Article 5, Section 24, of the charter authorizes the city commission to annually appropriate certain money from the general fund for certain purposes, among which is the following: "The establishment and maintenance of a Board of City Development, Chamber of Commerce, or other similar organization, under whatsoever name, devoted to the growth, advertisement, development, improvement and increase of taxable values of said city." .

By virtue of the power conferred by the charter, the mayor, on January 1, 1934, with the advice and consent of the city commission, appointed certain members of a board, who were designated as a chamber of commerce; and such board functioned, as contemplated by the charter, to promote the growth, advertisement, development, improvement and increase of taxable values of said city." The chamber of commerce elected as its secretary and manager A. L. Brooks, and as part of his duties he was to arrange the details for the fair to be held on the city fair grounds and make contracts for the attractions, exhibitions, etc.; and, acting in such capacity, he did perform such duties required of him, and the City collected a certain per cent. of the proceeds derived from the operation of such attractions.

1 Thus it will be seen that this State is liberal in allowing cities operating under the general law or the Home Rule Amendment to issue bonds for the purpose of buying, building, creating, and operating parks, swimming pools, golf courses, and other things provided by law. See House Bill 110, Chapter 453, page 1741, Acts Second Called Session, 44th Legislature, Vernon's Annotated Civil Statutes, Article 1015c. For a full discussion of the power of cities to own and operate parks, see City of Waco v. McCraw, 127 Texas 268, 93 S. W. (2d) 717.

2 The provisions of the charter authorize the City to levy and

collect certain funds to be devoted to certain public purposes. What constitutes a public purpose under charter provisions, has received much consideration. In discussing what is a public purpose, McQuillin on Municipal Corporations, (2d ed.) Vol. 6, p. 292, Section 2532, says: "What is a public purpose cannot be answered by any precise definition further than to state that if an object is beneficial to the inhabitants and directly connected with the local government it will be considered a public purpose." See, also, Cooley's Constitutional Limitations, (5th ed.) p. 155; Words & Phrases, (1st series) Vol. 6, pp. 5815, 5816, 5817.

This Court has upheld a similar provision in charters adopted by other cities under the Home Rule Amendment. See Davis v. City of Taylor, 123 Texas 39, 67 S. W. (2d) 1033; Anderson v. City of San Antonio, 123 Texas 163, 67 S. W. (2d) 1036.

In this instance the City acquired a park, embracing considerable acreage, and used it for the purpose of advertising the advantages of the City. Carnivals and other amusements were permitted to be operated within the limits of the park, for which certain fees were charged those who desired to patronize them. It is shown that considerable sums of money were collected and used by the chamber of commerce for improvements in the park. It was not contended that the device was not negligently constructed, nor was it contended that it was inspected for defects by the agents of the City. The question presented for decision here is one purely of law.

**3, 4** There are two outstanding rules relating to the liability of a municipal corporation in the performance of its functions: (1) The rule is well settled that a municipal corporation is not liable for the negligence of its agents and employees in the performance of purely governmental matters solely for the public benefit. City of Dallas v. Smith, 130 Texas 225, 107 S. W. (2d) 872, and cases cited; Gartman v. City of McAllen, 107 S. W. (2d) 879; City of Fort Worth v. Wiggins, 5 S. W. (2d) 761; City of Amarillo v. Ware, 120 Texas 456, 40 S. W. (2d) 57; Trenton v. New Jersey, 262 U. S. 182, 67 L. Ed. 937, 29 A. L. R. 1471, 43 Sup. Ct. Rep. 534; 30 Texas Jurisprudence, Section 289; McQuillin on Municipal Corporations, (2d ed.) Vol. 6, Sections 2793 and 2796. On the other hand, (2) the rule is equally well settled that where a municipal corporation acts not as an arm of the government, but in its private capacity, for the benefit only of those within its corporate limits, it is liable for the negligence of its representatives. City of Waco v. Branch et al., 117 Texas 394, 5 S. W. (2d) 498, id.

(Civ. App.) 8 S. W. (2d) 271; City of Amarillo v. Ware, 120 Texas 456, 40 S. W. (2d) 57; 30 Texas Jurisprudence, Section 299; McQuillin on Municipal Corporations, (2d ed.) Vol. 6, p. 1058, Section 2796. For a discussion by the various courts of the liability of cities for injuries due to the conducting of parks, see Notes, 29 A. L. R. 863; 42 A. L. R. 263; 46 A. L. R. 1438.

5   We think it is shown by this record that the City of Harlingen operated the park in a proprietary capacity, and not purely for governmental purposes. It is also further shown that the City conducted the park in such a manner as to derive revenue therefrom, by permitting rodeos, carnivals, and other amusements to use parts thereof. The City therefore is liable for the failure to exercise ordinary care to prevent the operation of a defective or dangerous machine or device in the park. Scroggins and his family were permitted to enter the park, and by paying certain charges were entitled to enjoy the amusements thus afforded. The jury exonerated him of all negligence. The carnival was being carried on in the park with the consent and acquiescence of the City, and certain sums of money derived from the carnival were being spent on improvements in the park. Under this state of facts, we think the negligence of those operating the device under consideration was imputable to the City, and furnished a basis for liability for resulting injury to those injured on account of the defective condition of such device. In other words, it is the duty of those who operate attractions for profit in public parks to exercise ordinary care to see that such devices are not defective or dangerous; and those who rightfully enter such parks, and pay the fees charged for the privilege of enjoying the attractions operated therein, are entitled to be protected from the negligence of those who are responsible for the operation of the attractions and whose duty it is to inspect them. City of Waco v. Branch et al., supra; City of Fort Worth v. Wiggins, supra; 30 Texas Jurisprudence, p. 541, Section 299.

This record clearly shows that, by virtue of the provisions of its charter, the City maintained a chamber of commerce for certain purposes, one of which was to operate a fair in its park, for the purpose of advertising the advantages of the City of Harlingen. It clearly appears that the chamber of commerce was a branch of the city government, and that its secretary, A. L. Brooks, was acting for the benefit of the City in the performance of his duties.

It is contended that the officials of the City had no authority,

under the law or its charter, to conduct a fair under the management of A. L. Brooks, as was done, and that such acts were ultra vires. The City requested the trial court to instruct the jury to return a verdict in its favor; which request was denied. Among other things, the jury found that the substance of the agreement made by Brooks for the operation of the carnival was known to and acquiesced in by a majority of the members of the chamber of commerce, and by the mayor and a majority of the city commissioners. It is plain that they attempted to perform a public service for the City. In view of this record, we do not think it could be held, as a matter of law, that the acts of the city officials were ultra vires.

The plaintiff's petition was good as against a general demurrer, and the judgment of the trial court finds support in the findings of the jury. Therefore the judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

Opinion delivered February 9, 1938.

### ON REHEARING.

The Court of Civil Appeals in its opinion written in this case discussed only one question, and held that the acts of the officers of the City of Harlingen, in connection with the operation of the Valley Mid-Winter Fair, were ultra vires, and that the City was not responsible therefor. This holding settled the case in so far as the liability of the City of Harlingen was concerned, and the judgment of the trial court was reversed and the cause remanded. 101 S. W. (2d) 632. This Court reversed that holding, and held that the acts of the officers of the City were not ultra vires, and affirmed the judgment of the trial court.* 112 S. W. (2d) 1035.

A motion for rehearing has been filed by the City of Harlingen. Our attention. is called to the fact that the Court of Civil Appeals in its disposition of the case did not determine certain assignments of error presented by appellants, relating to the excessiveness of the verdict, the admissibility of certain testimony, and the sufficiency of the evidence to support the verdict.

6 We adhere to the correctness of our conclusions on the questions discussed in our original opinion. However, we have concluded that we were in error in affirming the judgment of the

---

*Opinion pages 237 to 249 of this volume.

trial court, for the reason that some of the assignments are not within the jurisdiction of this Court; and it is therefore necessary to remand the case to the Court of Civil Appeals for further consideration of such assignments. Baker et al. v. Fogel et al., 110 Texas 301, 219 S. W. 450; Bird v. Ft. Worth & R. G. Ry. Co., 109 Texas 323, 207 S. W. 518; Mills v. Mills, 111 Texas 265, 231 S. W. 697; Texas & N. O. Ry. Co. v. Stevens, (Tex. Com. App.) 24 S. W. (2d) 9; Crawford v. El Paso Sash & Door Co., (Tex. Com. App.) 289 S. W. 994.

It is therefore ordered that the judgment heretofore entered in this cause be set aside; that the judgment of the Court of Civil Appeals be reversed; and that this cause be remanded to that court for such further proceedings, not inconsistent with our opinion, as may be necessary for a disposition of the assignments relating to the excessiveness of the verdict, the admissibility of certain testimony, and the sufficiency of the evidence to support the verdict, not heretofore determined by it.

Opinion delivered March 30, 1938.