## CITY OF TYLER v. INGRAM.

### No. 5824.

Court of Civil Appeals of Texas. Texarkana.

Nov. 5, 1941.

Rehearing Denied Dec. 4, 1941.

Troy Smith, of Tyler, for appellant.

Jones & Jones, of Marshall, and Nat Gentry, Jr., of Tyler, for appellee.

JOHNSON, Chief Justice.

This suit is by Clara Belle Ingram against the City of Tyler to recover damages for personal injuries alleged to have been sustained as the result of defendant's negligence.

On September 30, 1938, and at all times here material, the city of Tyler owned and operated a public park consisting of about six acres located within the corporate limits and known as Bergfeld Park. The tract was equipped with the usual devices and was maintained by the city as a place of amusement and recreation. It contained an amphitheater in which the city gave free band concerts and other amusement programs once or twice a week, under supervision of its Superintendent of Parks. For purposes of advertising the superior quality of roses grown in and around Tyler and promoting the rose-growing in-

dustry in its trade territory, there was annually held in the city a rose festival, first under the auspices of the East Texas Rose Festival Ass'n and later under the Texas Rose Festival Ass'n, both incorporated. On the date above mentioned an entertainment crowning the queen of the rose festival was held in the amphitheater of Bergfeld Park, as in previous years. In preparation for the entertainment, the Texas Rose Festival Ass'n rented bleachers from the Louisiana State Fair, shipped them from Shreveport, Louisiana, to Tyler and reconstructed them in Bergfeld Park on the ground adjacent to, and supplementing the seating capacity of the amphitheater. The amphitheater, including the bleachers, was enclosed with canvas and wire fencing. Members of the Texas National Guard were employed by the Association to prevent persons without a pass or paid admission ticket from entering the enclosure. Clara Belle Ingram purchased a ticket and entered the enclosure, and was seated on said bleachers to witness the entertainment. The bleachers collapsed, and as the result she sustained severe injuries, breaking her back and paralyzing her to the extent of rendering her a cripple for life.

In her third amended original petition, plaintiff alleged in substance that the city sponsored and promoted the rose festival association and in connection with which various exhibitions were offered to the public for paid admissions; that the one in question was held on property owned and maintained by the city, with its express and implied consent and for the promotion of the interest, benefits and advancements of the city; that the city expressly and impliedly invited the public to make use of the premises, a public park; that the staging of such exhibitions and entertainments was calculated to and did benefit the city through increased trade and taxable property values; that the bleachers were negligently constructed on unlevel ground with insufficient braces and improper foundations; that the placing of the bleachers in the park, in the manner of their negligent construction, and the giving of the entertainment was all with the city's knowledge and consent; that with such knowledge and consent the city negligently and carelessly permitted the bleachers to be so erected and to so remain on such unlevel ground and in such dangerous condition, notwithstanding the provisions of its building code and ordinances against unsafe structures, and notwithstanding that the same constituted a nuisance, which the city in the exercise of ordinary care should have abated and prevented the use thereof by the public; and that the city negligently failed to perform its non-delegable duty of keeping its public park, including the bleachers erected therein, in a reasonably safe condition for use of the public.

The city answered by general demurrer, special exceptions, a general denial, a sworn denial of any partnership or joint adventure relations with either of the rose festival associations; and that if it were so engaged, its actions were ultra vires.

Upon trial of the case, in response to special issues, the jury found:

(1) That the location of the bleachers and the manner in which they were constructed on the ground, as they then existed, made them essentially dangerous for use of the public.

(2) That the City of Tyler, through its agents and employees, knew of said essentially dangerous condition, in time, by the exercise of ordinary care, to have prevented the use of the bleachers in such condition.

(3) Special issue No. 3 was conditionally submitted and was not answered.

(4) That such essentially dangerous condition of the bleachers was a proximate cause of the injuries sustained by plaintiff.

(5) That the City of Tyler through its agents, servants and employees failed to exercise ordinary care to prevent said bleachers, as situated, from being used by the public.

(6) That such failure of the City of Tyler to exercise ordinary care to prevent the use of said bleachers by the public was a proximate cause of plaintiff's injuries.

(7) That Ernest Wilks, Building Inspector for the City of Tyler, was acting in his official capacity when he inspected the bleachers.

(8) That during all the 30-day period immediately following her injuries plaintiff was mentally and physically incapacitated from either giving or authorizing any one to give notice in writing to the City Manager or the City Clerk of the City of Tyler of her injuries and of where and how it occurred and of her claim for damages.

(9) That the City of Tyler did not relinquish complete control and management of that section of Bergfeld Park in

which the bleachers were erected to the Texas Rose Festival Ass'n on the occasion in question.

(10) That the Texas Rose Festival Ass'n did not construct said bleachers, as they were constructed at the time in question, without the aid and assistance of the City of Tyler.

(11) That plaintiff's injuries were not the result of an unavoidable accident.

In answer to Special Issues 12 and 13 the jury assessed the damages sustained by plaintiff.

Upon plaintiff's filing a remittitur of $1,544, judgment was entered for plaintiff upon the verdict. From an order overruling its motion for new trial, defendant perfected its appeal.

By its first proposition appellant charges that the trial court erred in overruling its motion for a directed verdict and its motion for judgment non obstante veredicto, because, it is contended, the undisputed evidence shows that the Texas Rose Festival Ass'n took complete possession and control of that part of appellant's public park on which the accident occurred, enclosed same and erected the bleachers thereon, all without appellant's consent; and that appellant received no compensation for such use of its property. The proposition is not sustained. The findings of the jury are not without proper support in the evidence. It is true that appellant issued no written permit authorizing the festival association to erect the bleachers and put on the entertainment in its park on the occasion in question, but it was all done with appellant's actual knowledge and implied consent, just as had been the custom during previous years. In fact, the testimony tends to show and the jury found that appellant never relinquished complete control of that part of the park so enclosed by the festival association. It further appears that such knowledge and consent of appellant extended to the manner in which the bleachers were permitted to be constructed. L. S. Pockrus, appellant's Assistant Building Inspector, was in the park in the afternoon before the bleachers were used that night, inspecting the wiring being placed in the amphitheater adjacent to the bleachers. He did not inspect the bleachers, but observed that they were located on sloping ground, Ernest Wilks, Chief Building Inspector for the city, testified to the effect that he inspected the bleachers, but not "very closely," during the day before they were used and collapsed that night. The first time he inspected the bleachers was about two o'clock in the afternoon, and he observed that some of the 1 x 12 seating boards were warped, rendering them unsafe, whereupon he made inquiry and learned that Mr. John Womble, who works for the Chamber of Commerce and is an official in the rose festival association, had charge of the seating for the entertainment in the park. Upon being unable to contact Mr. Womble at that time, Mr. Wilks instructed the young lady in Mr. Womble's office that the defective seating boards on the bleachers would have to be changed. She promised to get in contact with Mr. Womble. Later in the afternoon Mr. Wilks was notified that there would be a crew of men available at the bleachers, at five o'clock, to make the required changes in the bleachers. Mr. Wilks went to the park at the appointed hour, and, under his directions, the defective boards were changed, one or two 2 x 4's and a loose iron bar were nailed, and one 2 x 4 at the bottom of the bleachers was discarded. Whereupon, Mr. Wilks was asked if he would recommend any other changes and he did not direct that any other changes be made. So it appears that appellant not only had actual knowledge of and impliedly consented to the placing of the bleachers in its public park, but it advised in and impliedly approved the manner of their construction, and permitted them to be used in the dangerous condition resulting in their collapse. The negligent manner in which the bleachers were constructed consisted, in part, in setting them on sloping and unlevel ground, facing approximately west, with the northeast corner downhill, careened toward the north end, whereby the weight was forced off center and sidewise instead of in the normal direction of straight down. The testimony shows that the position in which the bleachers were placed made them essentially dangerous for use, and that such dangerous condition was obvious.

It is true, as contended, that appellant did not share in the gate receipts derived from the entertainment, but it is shown that the rose festivals were put on for the purpose of promoting the rose-growing industry of which the city of Tyler is the center; and for each year that the rose festivals were given, annually since 1934, the taxable values of the property in the city have increased. The advertisement of the city and its rose-growing industry, the stimulation

of its trade and annual increase of its tax-able property values, were of material benefit to the city. It is apparent that the city was not disinterested in the object and results obtained through the rose festivals, of which the crowning of the queen on the occasion in question in its public park was a part.

By its second proposition appellant contends that the negligence for which it is sought to be held liable was committed, if at all, in the performance of a governmental function, as distinguishable from a proprietary function, and by reason of which no liability can attach to the city. It is a rule of general application that a city is not liable in damages resulting from its negligence in performing a governmental function; whereas, in the exercise of powers concerning matters of peculiar advantage to its inhabitants, from which the public at large but casually derives benefits, the city acts in its proprietary capacity and is liable for its failure to use ordinary care. The first distinctive effort of the courts of this State to differentiate governmental and proprietary functions appears in City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517, wherein Justice Stayton said:

"It would seem that, in so far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public—purposes pertaining to the administration of general laws made to enforce the general policy of the state,—they should be deemed agencies of the state, and not subject to be sued for any act or omission occurring while in the exercise of such power, unless, by statute, the action be given; that, in reference to such matters, they should stand as does sovereignty, whose agents they are, subject to be sued only when the state, by statute, declares they may be. * * * In so far, however, as they exercise powers not of this character, voluntarily assumed —powers intended for the private advantage and benefit of the locality and its inhabitants,—there seems to be no sufficient reason why they should be relieved from that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for a purpose essentially private would be liable."

With few exceptions, the courts of the country are in agreement on the general rule, but in its application to particular facts the decisions of the courts of the different states are not all in accord, and there is some conflict in the earlier decisions in this state. It would serve no beneficial purpose to here review the conflicts, since "it was because of this conflict" that a writ of error was granted in Wiggins v. City of Fort Worth, Tex.Civ.App., 299 S.W. 468, and the Commission of Appeals held in 5 S.W.2d 761, 763, that in its operation, maintenance and control of a public park a city is acting in a proprietary capacity. In City of Waco v. Branch, Tex.Com.App., 5 S.W.2d 498, 499, opinion adopted by Supreme Court, answering a certified question, it was held:

"In this state, however, the trend of decision is toward what we regard as the sounder view that the maintenance of a public park by a city is a proprietary function, exercised primarily for the peculiar advantage of the inhabitants of the municipality, although members of the general public incidentally become entitled to enjoy the recreational advantages thus afforded. For this reason, we think that negligence imputable to the city, with respect to the safety of those in lawful use of the park, may furnish ground of liability for resulting injury. In arriving at this conclusion we have been guided in a large measure by a consideration of the following decisions: Galveston v. Posnainsky, 62 Tex. [118], 127, 50 Am.Rep. 517; Fort Worth v. Crawford, 64 Tex. 202, 53 Am. Rep. 753; White v. San Antonio, 94 Tex. 313, 60 S.W. 426; Ostrom v. San Antonio, 94 Tex. 523, 62 S.W. 909."

The facts here show that appellant was indirectly interested in, knowingly permitted and consented to the erection and use in its public park, a nuisance or essentially dangerous condition from which injury was liable to result. In such circumstances a city may not claim exemption from liability upon the ground that it is acting in a governmental capacity. Vanderford v. City of Houston, Tex.Civ.App., 286 S.W. 568; Wiggins v. City of Ft. Worth, Tex.Civ.App., 299 S.W. 468, affirmed in City of Ft. Worth v. Wiggins, Tex.Com. App., 5 S.W.2d 761; Scroggins v. City of Harlingen, 131 Tex. 237, 112 S.W.2d 1035, 114 S.W.2d 853; City of Waco v. Branch, supra.

By its third proposition appellant contends that the trial court erred in overruling its motion for a directed verdict and for judgment non obstante veredicto, be-

cause the uncontradicted evidence shows that appellee never gave notice in writing of her injuries to the city as required by Section 79 of its charter, reading as follows:

"Before the City of Tyler shall be liable for damages of any kind involving property damages or personal injuries or otherwise, the person injured or·claiming such damages, or someone in his behalf, shall give the City Manager or City Clerk notice in writing of such damage or injury within thirty days after the same has been received, stating specifically in such notice when, where and how the exact injury or damages occurred and the full extent thereof."

The notice required by said Section 79 of appellant's charter was not given by appellee. As an excuse for not giving the notice, or as facts constituting an exception to which the charter provision does not apply, appellee alleged that during the whole period of the 30 days immediately following her injury she was confined in a hospital, unconscious, and under influence of drugs, and being mentally and physically incapable of giving such notice. The jury found that during all the 30 days following her injury appellee was mentally and physically incapacitated from giving or authorizing any one to give for her such notice. Appellant first contends that compliance with the requirements of its charter as to notice within 30 days from date of injury is a condition precedent to maintenance of the suit, notwithstanding the fact that as a result of the injuries appellee was immediately and continuously during such 30-day period rendered mentally and physically incapacitated to give or authorize any one to give for her such notice. We are unable to agree with the contention. Similar charter provisions, as applicable to notice of personal injury, are held to be a reasonable limitation upon the exercise of a common law right and therefore constitutional and valid. City of Dallas v. Shows, Tex.Com.App., 212 S.W. 633; Cawthorn v. City of Houston, Tex.Com.App., 231 S. W. 701; City of Terrell v. Howard, 130 Tex. 459, 111 S.W.2d 692. But such holdings were made upon facts not showing that the injured person was rendered mentally and physically incapable of giving the notice. To hold that a city may, upon adopting such a charter provision, wrongfully injure a person to the degree of rendering the victim powerless to comply with its terms, and then avoid liability by invoking such charter provision in bar of the right to sue, would constitute a complete denial and abrogation of the claimant's right of recourse to the courts. Obviously, if given such effect, the charter provision would clearly violate the constitutional guaranty that "All courts shall be open, and every person for an injury done him, in his * * * person * * * shall have remedy by due course of law." Constitution of Texas, Art. 1, § 13, Vernon's Ann.St.; City of Terrell v. Howard, supra; Hanks v. City of Port Arthur, 121 Tex. 202, 48 S.W.2d 944, 83 A.L.R. 278. We think the legislative intent in requiring the notice necessarily presupposes the existence of a person capable of giving it, and therefore applicable only to such persons. Upon such grounds only, and with such implied exception to its application, can the charter provision be held constitutional in this state, where the right to sue a city for actionable negligence is held to be a common law right as distinguishable from such a right when created by statute.

■■■ Appellant further contends in substance that should it be held that appellee, on account of her incapacity to do so, was not required to give the notice as prescribed by the charter, then in such event, the charter provision should by construction be extended so as to embrace a requirement that the injured party give such notice within a reasonable time after regaining capacity. The facts here would warrant a finding that sometime after expiration of 30 days from date of her injury and prior to the filing of the suit, appellee was at least able to authorize some one to give appellant notice in writing of when, where and how the injuries occurred. No such notice was given by appellee prior to filing her petition. The record shows that appellant had actual knowledge of all the facts, immediately after the injury, through its officials making an investigation at the scene of the accident and at hospital to which. appellee was removed. No advantage was gained by appellee and no disadvantage suffered by appellant, and none claimed, for failure to receive notice in writing of the injury from appellee prior to the filing of her petition. If we had the power to do so, there are no facts in this case upon which we could justify our action in writing into the charter the additional requirement here contended for. On the other hand, the language of the charter

provision is clear and unambiguous in expressing the requirement therein contained. The provision as written contains no room for implication of intention on the part of the city to make any requirements as to notice other than those expressed. It presents no grounds for expansion by construction. Such requirements of notice of injuries as a condition precedent to an action is in derogation of common law right, and should therefore be construed with reasonable strictness, "and not extended by implication beyond its own terms," is the settled rule of law in this state. City of Dallas v. Shows, supra [212 S.W. 634]; Cawthorn v. City of Houston, supra.

By its 9th proposition appellant complains of the trial court's definition of the term "unavoidable accident" reading as follows: "By the term 'unavoidable accident' as used herein, is meant an occurrence which happened suddenly and unexpectedly without fault on the part of any one." Contention is made to the effect that the definition is erroneous, in that it excludes the theory that the occurrence could have been an unavoidable accident as between appellant and appellee although brought about by the negligence of the Texas Rose Festival Ass'n. The contention is not without support in the authorities relied upon by appellant, namely, Dallas Ry. & Terminal Co. v. Redman, 113 S.W.2d 262; Dallas Ry. & Terminal Co. v. Boland, Tex.Civ.App., 53 S.W.2d 158. However, the reasoning in those cases has been expressly rejected by the Supreme Court in Hicks v. Brown, 136 Tex. 399, 151 S.W.2d 790. The proposition is not sustained.

By its 10th proposition appellant makes the contention that it did not have the power to prevent the erection and use of the bleachers in its park, therefore the court erred in assuming that it possessed such power in the submission of special issue No. 5, reading:

"Do you find, from a preponderance of the evidence, that the City of Tyler, through its agents, servants or employees, failed to exercise ordinary care to prevent said bleachers, as situated, from being used by the public? Answer 'Yes' or 'No.'"

The contention is not sustained. The City of Tyler adopted its charter under the Home Rule Amendment, Art. 11, § 5, Constitution of Texas; Title 28, Chap. 13, Art. 1165 et seq., Vernon's Annotated Civil Statutes. Among the broad powers possessed by the city are those specified in Art. 1175, from which we quote the following pertinent excerpts:

"[Sec.] 3. To hold by gift, deed, devise or otherwise, any character of property. * * * [Sec.] 16. To have exclusive dominion, control, and jurisdiction * * * over * * * the * * * public grounds of such city. [Sec.] 18. To control, regulate and remove all obstructions or other encroachments or encumbrances on any public * * * ground * * *. [Sec.] 19. * * * power to define all nuisances and prohibit the same within the city * * * to police all parks or grounds * * * owned by said city. [Sec.] 22. To regulate the location and control the conduct of * * * all places of public amusements. [Sec.] 25. To provide for the condemnation of dangerous structures. [Sec.] 34. To enforce all ordinances necessary to protect health, life and property, and to prevent and summarily abate and remove all nuisances and to preserve and enforce the good government, order and security of the city and its inhabitants."

Pursuant to its powers, the city enacted ordinances of which we quote the following excerpts from provisions of its Building Code introduced in evidence:

"Sec. 2. No wall, structure, building or part thereof shall hereafter be constructed within the City of Tyler, except in conformity with the provisions of this ordinance. No building * * * hereafter to be built * * * shall be built in any manner that would violate any of the provisions of this ordinance or the approval issued hereunder. Sec. 3. Before the erection * * * of any * * * structure * * * or any platform, staging or flooring to be used for standing or seating purposes is commenced, the owner or agent or lessee, or either, or the architectural builder * * * shall apply to the Building Inspector for a permit to do such work. Structures hereafter erected without permits or not in conformity with this Code shall be removed. Sec. 26. Every building, structure or part thereof which shall appear to the Building Inspector to be dangerous by reason of * * * defective construction * * * shall be held to be unsafe. The Building Inspector shall notify the owner or lessee of any such buildings to cause the same to be safe, and shall affix a notice of the dangerous character of the structure in a conspicuous place on the

exterior of said building, and no person shall remove or deface such notice so affixed. Sec. 25. All parts of every building shall be designed to safely carry the load to be imposed thereon, and shall in all respects conform to good engineering practice. Sec. 37. The office of Building Inspector is hereby created and he is hereby authorized and empowered * * * to enforce all ordinances regulating and relating to the construction, equipment, management, and condition of all property within the City of Tyler; and it is hereby made the duty of the Departments of Police * * * to assist in enforcement of this ordinance."

As applicable to the facts here raised, the power of the city granted in Section 34 of Article 1175, above quoted, to "summarily abate and remove all nuisances" includes the power to prevent the erection and use in its public park of any essentially dangerous thing from which injury is likely to result. Wiggins v. City of Fort Worth, Tex.Civ.App., 299 S.W. 468, affirmed, Tex.Com.App., 5 S.W.2d 761; Scroggins v. City of Harlingen, 131 Tex. 237, 112 S.W.2d 1035, 114 S.W.2d 853.

Appellant's other propositions have been examined and they are overruled.

The judgment of the trial court will be affirmed.