HEINO *v.* CITY OF GRAND RAPIDS.

1. MUNICIPAL CORPORATIONS—NEGLIGENCE — GOVERNMENTAL FUNCTIONS—PERMISSIVE—MANDATORY.

So far as the liability of a municipal corporation, as a governmental agency, for negligence in the performance of governmental functions, when assumed, is concerned, it is immaterial whether the authorized public duty be permissive or mandatory.

2. SAME—PARKS—SWIMMING POOLS—NUISANCE.

An artificial pond of shallow water, established and maintained by the city of Grand Rapids as a public swimming pool in a public park, is an appropriate and common accessory to the ornamental features of the park, and is .

not to be classed as a dangerous or attractive nuisance, but is within the beneficent purpose for which the park was authorized. Section 2, Art. 8, Const. Mich.; Act No. 593, Local Acts 1905.

3. SAME — STATUTORY LIABILITY — NEGLIGENCE — GOVERNMENTAL FUNCTIONS.

In Michigan it is the rule that a municipality, in the absence of special statute imposing liability, is not liable for the tortious acts of its officers and servants in connection with the gratuitous performance of strictly public functions, imposed by mandate of the legislature or undertaken voluntarily by its permission, from which is derived no special corporate advantage, no pecuniary profit, and no enforced contribution from individuals particularly benefited by way of compensation for use or assessment for betterments.

4. SAME—RIGHT OF ACTION—DEATH.

There being no applicable statute conferring a right of action, there could be no recovery from a municipal corporation for alleged negligence in the death of a boy 8 years and 3 months of age, drowned in a swimming pool maintained in a public park by defendant, since in the maintenance of said park and swimming pool defendant municipality was performing a governmental activity.

Error to superior court of Grand Rapids; Dunham, J. Submitted April 3, 1918. (Docket No. 22.) Decided July 18, 1918.

Case by Alfred Heino, administrator of the estate of Roy Heino, deceased, against the city of Grand Rapids for the alleged negligent drowning of plaintiff's decedent. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*G. A. Wolf* and *Ellis & Ellis*, for appellant.

*Ganson Taggart*, City Attorney, and *Charles A. Watt*, Deputy City Attorney, for appellee.

STEERE, J. On August 10, 1915, Roy Heino, a boy eight years and three months of age, lost his life,

presumably by drowning, in a public swimming and bathing pool maintained by defendant in one of its city parks. Alfred Heino, his father, brought this action as administrator to recover damages for his death, claiming it was attributable to negligence on the part of the city in not properly guarding the safety of children permitted free use of the pool.

The case was tried in the superior court of Grand Rapids before a jury and a verdict directed in favor of defendant, the trial court holding that in providing and maintaining the bathing pool for the free use and recreation of its inhabitants the city was acting under legislative authority and discharging a governmental duty in performance of which it was not liable for damages resulting from negligent acts of its servants or employees; and that in any event no actionable negligence was shown as there were no witnesses to the drowning; both the cause and manner of its occurrence being purely speculative.

The pool in question was a sheet of shallow water, from 350 to 360 feet long and about 175 feet across at the widest place, located in a basin on the southwesterly side of the park, where its level was maintained by a controlled supply of water from two small creeks which could be led into or diverted from it. The contour of that portion of the park afforded natural facilities for its construction by a gradual slope of the ground to a depression in which water from the creeks could be impounded to create a pool of the size and depth desired by building a semicircular wall or dam of concrete 55 feet in length at the westerly or lower end, near which the water was deepest, gradually shallowing toward the shores and back to the east. The superintendent of parks, who stated he built the pool, estimated its greatest depth at between four and five feet which he located about ten feet back, or east, of the spillway of the dam, there being a spring-board at

the west end from which he stated that he had seen men dive in there and when they stood up their heads would be out of water. There was some conflicting evidence as to the exact depth in the deepest place. A brother testified that the water would be over deceased's head where his body was found, and he was shown to have been four feet, six inches tall.

Two small buildings were provided as changing or dressing rooms for bathers, referred to as the "boys' house" and the "girls' house," and different parts of the pool are mentioned as the "girls' side" and the "boys' side." In the bathing season a swimming pool director, or guard, was on duty during the hours when the pool was open to the public for swimming and bathing. Many children availed themselves of the privilege in warm weather, and the record of bathers on the day of the accident was 380, of which number there were 95 boys and 30 girls in the forenoon, and 150 boys and 105 girls in the afternoon. None of them were shown to have any knowledge of just when or how the accident occurred.

Plaintiff lived near Creston Park with his family, and his children were accustomed to go swimming, or bathing, in this pool, which was constructed by the city in 1909 or 1910. They were provided with bathing suits for that purpose, and on the day of the accident five of them went over there together at about ten o'clock in the forenoon to "go swimming," carrying their bathing suits in a basket. The oldest was a girl named Edna, over 9 years of age, Roy being the next younger and the others respectively 6, 5 and 2 years old. They played around the park until the guard came, after which they put on their bathing clothes and went into the pool. After changing to their bathing suits at the buildings provided for that purpose they went to the east end together, carrying their other clothing in the basket, which they left under a

tree when they went into the water. Roy stayed with the rest in the shallow water for a short time and while there borrowed some "water wings" from a girl who was with them, which he soon returned, and went away saying he was going over to the boys' side. He is not shown to have been seen alive by the other children or noticed by any one after that time, although there were also other people then in swimming, both boys and girls. When the Heino children were through swimming, or bathing, they found his dry clothing yet in the basket but could not find him. They waited for a time and looked for him unsuccessfully, after which they went home, arriving there shortly before 12 o'clock, and told of their inability to find him. This was reported to plaintiff when he came home to dinner soon after. A search was then instituted in which others joined, and his body was found in the lower part of the pool at about three o'clock that afternoon. He was shown to have been an active, healthy boy in the habit of going into this pool. His age and height were stated but whether he could swim was not disclosed.

The negligence charged was failure to maintain a rope or similar protection for the small children in the shallow end of the pool, that there were places in it where the bottom was muddy and soft, and that the guard was away from the pool, though yet in sight, watching a ball game during a portion of the time the children were there. To what extent such alleged negligence, if shown, may have caused or contributed to the boy's death would be largely a matter of conjecture, or inference on inference, for no one is shown to have seen him at the time, or to know how it happened, but the important question most seriously argued in the case is the immunity of the city from liability because acting in a governmental capacity in maintaining this

free swimming pool in its public park without pecuniary benefit, for the public good.

Section 22, article 8, of the State Constitution, authorizes any city to acquire, establish, and maintain parks within or without its limits for the public welfare. The revised charter of Grand Rapids, under which that city was operating when this accident occurred (Act No. 593, Local Acts 1905), also confers authority upon the city to provide, improve, and maintain at public expense, parks, boulevards, and other public grounds for the furtherance of urban convenience and civic betterment. Under title 3 of the charter, relating to "the powers and duties of the common council," it is given power, subject to the limitations of the act, to legislate upon various matters, amongst which it is authorized (section 15)—

"To provide for public parks, public grounds and squares, and improvement of the same, subject, however, to the provisions of title 11 of this act. May enact all needful ordinances and regulations for the protection and control of all parks, boulevards, cemeteries and other public grounds or places belonging to the city, whether within or without the boundaries thereof."

By section 53 of said title 3, it is again authorized, by a two-thirds vote of the aldermen elect, "to obtain by purchase, or gift, and to hold, improve, and properly maintain real estate within the limits of the city for park, driveway, and boulevard purposes." And likewise without the city limits, when deemed a necessary public improvement for the benefit of the city.

Under title 11 of the act (to which reference is made in section 15 of title 3) that subject is again taken up with the mandate that "there shall be created and constituted in and for the city of Grand Rapids a board of park and cemetery commissioners," etc. The mumber of members, manner of selection, terms of

office, etc., are prescribed, and by section 9 of said title 11 it is provided, amongst other things, that such board—

"shall have the control and management, and shall have charge of the care and improvement of all parks and public grounds of said city, whether within or without said city, and of such parks or public grounds as may hereafter be acquired, laid out, purchased or dedicated for public use by said city, * * * All the powers and duties now vested in the common council or in the board of public works of the city of Grand Rapids relating to said parks, public grounds or boulevards, are hereby transferred as provided in this title."

The park board is required to make an annual report to the common council of its doings and expenditures, with an estimate of the amount of money necessary for park purposes, etc., during the ensuing year, upon which the common council "shall make an appropriation for the care, maintenance, and improvement of the said parks of said city." The determined fund is thereafter raised by taxation and when collected into the city treasury "credited to the fund to be styled the park fund."

No suggestion is contained in any of these provisions relative to parks authorizing a business enterprise or municipal activity maintained for pecuniary gain, or contemplating compensation to the city, but on the contrary it is only empowered to provide at public expense met by taxation and furnish to the public gratuitously for the common welfare the recognized sanitary and social benefits which public parks afford. So far as its liability as a governmental agency for negligence in the performance of such functions when assumed is concerned, it is immaterial whether the authorized public duty be permissive or mandatory. *Tindley* v. *City of Salem*, 137 Mass. 171; *Nicholson* v. *City of Detroit*, 129 Mich. 246.

The tort here charged against the municipality is not for a direct trespass but for consequential injury resulting from the negligent conduct of its agent in providing and maintaining an authorized public park and appurtenances for the general pleasure, comfort, and health, free to all who desire to avail themselves of it. This "swimming pool," an artificial pond of shallow water with gradually sloping margins, was an appropriate and common accessory to the ornamental features of the park, not to be classed as a dangerous or attractive nuisance. To construct and permit its free use at proper times and under proper restrictions for bathing or swimming was within the beneficent purposes for which the park was authorized and established. The more serious question upon which counsel divide with sustaining authorities from other jurisdictions is whether in providing for and maintaining this park and pond for the purpose shown and under the authority conferred the city was acting in a legislative or governmental capacity for the public welfare, or in its authorized proprietary capacity was providing a local attraction in which private interest, as distinguished from public duty, was paramount.

As directly applied to public parks and liability of a municipality for injury to those patronizing them from negligence in their maintenance, the question has not been passed upon by this court and opposing counsel cite to their contentions conflicting decisions from other jurisdictions where accidents in parks are involved, their lines of authority harking from two opposing rules of municipal liability for tort sometimes called the New York and Massachusetts rules.

The New York courts early held that cities given by statute exclusive control of their streets were under a common-law liability for injuries resulting from negligence in their maintenance, and subsequently applied that rule to city parks (*Ehrgott* v. *City of New*

*York,* 96 N. Y. 264). Other States which have adopted that doctrine have followed in its application to cases involving the control and management of parks. Early in the history of this State it was held that, in the absence of statutory provisions, municipalities were not liable for failure to keep highways and bridges in safe repair. *Commissioners of Highways of Niles Township* v. *Martin,* 4 Mich. 557; *City of Detroit* v. *Blackeby,* 21 Mich. 84. In the latter case the New York rule was discussed and rejected in a carefully considered opinion by Justice CAMPBELL. In *Miller* v. *City of Detroit,* 156 Mich. 630, it is said of the New York rule:

"That this is illogical is shown by the cases of *Hill* v. *City of Boston,* 122 Mass. 334, and *City of Detroit* v. *Blackeby,* 21 Mich. 84."

The local polity of Michigan has often followed and been much influenced by that of the New England States, and the Massachusetts decisions as to municipal liability for torts generally taken as precedent.

The general rule of that State, the principles of which have been adopted in this and numerous other jurisdictions, is thus well stated in the recent case of *Bolster* v. *City of Lawrence,* 225 Mass. 387, where many preceding decisions on various phases of the subject will be found:

"The municipality, in the absence of special statute imposing liability, is not liable for the tortious acts of its officers and servants in connection with the gratuitous performance of strictly public functions, imposed by mandate of the legislature or undertaken voluntarily by its permission, from which is derived no special corporate advantage, no pecuniary profit, and no enforced contribution from individuals particularly benefited by way of compensation for use or assessment for betterments."

In the *Bolster Case* it was held that the city of Law-

rence, which maintained a public bath house by permissive legislative authority, was not liable for the death of one properly using the facilities offered, caused by the structure and its approaches falling through the negligence of the municipality or its servants.

In the foot-note to *Bisbing* v. *Asbury Park*, 33 L. R. A. (N. S.) 523 (80 N. J. Law, 416), where several leading cases upon both sides of the question as to liability of municipalities for injuries through unsafe conditions in parks or other public grounds than streets are digested, it is said the weight of authority supports the fundamental proposition "that a municipality maintaining public parks is discharging a public duty, and is not performing a private, corporate function for its own advantage."

It is further strenuously urged for plaintiff that this State is aligned by previous decisions with those adopting the contrary view, and said:

"The State of Michigan has never been, as a State, in the park business, and it has not delegated to any township or municipality the right to act for the State in any such capacity, but it has always, and in all of the statutes of this State, regarded the property so taken or used as the property and real estate of the municipality where it was situated," etc.

Citing in support of this contention the early cases: *City of Detroit* v. *Corey*, 9 Mich. 165; *People* v. *Hurlbut*, 24 Mich. 86; *Board of Park Com'rs* v. *Common Council of Detroit*, 28 Mich. 228; *Cooper* v. *City of Detroit*, 42 Mich. 584; *Mayor of Detroit* v. *Park Commissioners*, 44 Mich. 602; *Niles Water Works* v. *City of Niles*, 59 Mich. 324.

In the *Niles Case* the question involved and decided was the right of the city to contract an indebtedness for hydrants and meters without popular vote, in violation of the express provisions of its charter. The

*Corey Case* involved an accident from a sewer excavation in the street left in a dangerous condition and it was held that sewers of the city were its private property and their construction was not a governmental function. The *Cooper Case* involved an attempt by complainant to enjoin the city from continuing and enlarging a public market upon a strip of land claimed to be a part of a street, which the court held had been extinguished by legislative authority and the strip held by the city under claim of title for over 30 years, denying the injunction on the ground that "the statute of limitations long since made the city title impregnable." While the functions of a city are more or less discussed in those cases we discover nothing in them indicating the capacity in which a city provides, improves, and maintains a park at public expense.

The *Hurlbut Case* involved the validity of an act establishing a board of public works for the city of Detroit, tested by *quo warranto* proceedings to determine the right of members of its board of water commissioners and sewer commissioners to hold their respective offices after the act went into effect. In the four opinions filed a wide range was taken in the field of municipal government, historically and otherwise, the case taking near 70 pages of the printed report. The court was not then considering the question directly involved here, and while aid to plaintiff's contention may be extracted from some of the views there expressed, the only material question decided was the validity of the act then before the court.

*Board of Park Com'rs* v. *Common Council of Detroit, supra,* was an application for mandamus to compel the city council to provide for and order issuance of bonds to purchase lands for a park contracted for by the commissioners. In discussing the legislation creating the park commission and manner of selecting its members the conclusion was reached that

the persons named were appointees of the legislature who could not be regarded as representatives of the city for the purpose proposed, and the court had no power to aid it by legal process, "because, concerning as it does the private corporate interests of the city, it (the board's action) has been had without the consent of the city expressly or by implication given." In holding that the commissioners as appointees of the legislature did not then have the power to bind the city for an indebtedness to purchase land for parks, and that cities have the right to use their own discretion in regard to incurring indebtedness for property or improvements of local concern, it is evident, as applied to the question decided, the court regarded a city park as a matter of private corporate interest of the city rather than a public governmental activity. And in *Mayor of Detroit* v. *Park Commissioners, supra,* involving a demurrer to an information in the nature of a *quo warranto* to inquire into respondents' authority to usurp a franchise under which they took possession of Belle Isle for the purpose of improving it as a public park, the court conceding in comment relator's contention that the city was acting in its private corporate capacity, held under the authority conferred by statute the right of the city to take possession of and improve lands outside the city limits as a public park was a franchise, saying in conclusion:

"If respondents usurp it they usurp a public franchise, public so far as concerns the city, which is all that is important here."

It is manifest that in these cases where parks figure, the question of liability or non-liability of the municipality for imputed negligence in their free maintenance for the public welfare, without compensation for their use or pecuniary benefit to the city, was foreign to the issues involved, and, so far as appears, not

advertently discussed or even mentioned. That certain functions of municipal activity may be governmental for some purposes and of private characteristics, in others, is recognized. *O'Leary* v. *Board of Fire and Water Com'rs*, 79 Mich. 281; *Brink* v. *City of Grand Rapids*, 144 Mich. 472; *Davidson* v. *Hine*, 151 Mich. 294; *Simpson* v. *Paddock*, 195 Mich. 581.

Counsel's statement that "Michigan has never been, as a State, in the park business," nor recognized parks as a matter of State concern, can be accepted as more applicable to the time when those cases relative to the Detroit park board were before the court than later. Michigan through its legislature has recognized the acquisition, improvement, and maintenance of free public parks as a governmental function by itself acquiring, improving, and maintaining at State expense, under the supervision of its appointed board, the Mackinac Island State Park; and, independent of the legislature, the people of the State, by adopting its present Constitution, have authorized *any* city or village to acquire and maintain parks, even without their corporate limits, grouping them with works which involve public health and safety. The Federal government is also in "the park business" as a governmental function, and whether they be Federal, State, or municipal parks the beneficial public purpose intended and served by such free recreation grounds for the people, and the resultant benefits which justify their free maintenance at public expense as a governmental activity are the same except it be in degree; and in that particular a comparison of the beneficial results to the greatest number of people at large throughout this commonwealth from the free use and enjoyment of Belle Isle City Park and Mackinac Island State Park might indicate the degree is not necessarily in favor of the larger governmental unit.

While, like public schools for education, public parks

are primarily provided for the recreation, pleasure and betterment of the people within the limits of the governmental organizations which maintain them, they are not by legal restraint or custom or in fact solely for the benefit of the municipality's own inhabitants, but when thrown open as public parks the public generally without distinction are permitted to visit them and freely enjoy the attractions and benefits gratuitously offered.

Along the line of facilities which parks afford, playgrounds for healthy exercise, swimming pools, baths, appliances for manual training and other equipment for balanced physical and mental development, with instructors as to proper use and methods, are now recognized and frequently adopted in the curriculum of our public schools as essentials of education and sanitation, both acknowledged subjects of State concern and governmental activity.

It is said imputed negligence is a matter of public policy, subject to legislative regulation and "it is for the legislature to determine how far, if at all, a body whose negligence, if it is so called, is imputed, and in no sense actual, shall be made subject to suit for the misconduct of its employees." *O'Leary* v. *Board of Fire and Water Com'rs, supra*. No right of action conferred by statute is applicable here. The constitutionally authorized function this municipality was exercising was without private gain to the corporation or to individuals, for purposes essentially public and of a beneficial character in furtherance of the common welfare in harmony with the general policy of the State and was in its nature a governmental activity, whether it be put upon the ground of health, education, charity, social betterment by furnishing the people at large free advantages for wholesome recreation and entertainment, or all of them.

As applied to public parks of this nature the funda-

·mental proposition of the Massachusetts rule, which this court has generally approved, is well sustained by the reasoning in the following cases and those they lead to: *Tindley* v. *City of Salem, supra; Donahue* v. *City of Newburyport,* 211 Mass. 561; *Bolster* v. *City of Lawrence, supra; Blair* v. *Granger,* 24 R. I. 17; *Bisbing* v. *Asbury Park, supra; Board of Park Com'rs* v. *Prinz,* 127 Ky. 460; *Mayor, etc., of Nashville* v. *Burns,* 131 Tenn. 281; *Harper* v. *City of Topeka,* 92 Kan. 11; *Russell* v. *City of Tacoma,* 8 Wash. 156.

Judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.