CARLISI *v.* CITY OF MARYSVILLE.

1. MUNICIPAL CORPORATIONS—DEFENSE OF GOVERNMENTAL IMMUNITY —GOVERNMENTAL CAPACITY.

A municipality is deemed to be acting in a governmental capacity if the conferral by the legislature of the powers involved is for public purposes exclusively, in which case the defense of governmental immunity may be interposed.

2. SAME—DEFENSE OF GOVERNMENTAL IMMUNITY—PRIVATE ADVANTAGE.

A grant by the legislature of power to a municipality for the purposes of private advantage and emolument would put the municipality on the same footing as any private individual without the shield of governmental immunity.

3. SAME—WATERFRONT LAND—WATER FILTRATION PLANT—BOAT RAMP—PROPRIETARY FUNCTION.

The primary legislative objective and purpose in designating a city-owned waterfront area of land approximately 100′ x 120′ along river and used to accommodate the city's water filtration plant, operated for profit, and for boat ramp available for public use but for a fee to some people, was for purposes of private advantage and emolument, a proprietary capacity, the use of the premises as a vantage point to view river activity and for swimming and wading, being but an incidental benefit.

4. SAME—WATER FILTRATION PLANT—BOAT RAMP—DANGEROUS CONDITION OF PREMISES—WARNING.

Premises used by city for water filtration plant and boat ramp purposes stood as an individual possessor of land with duties imposed by law, being subject to liability for bodily harm

---

REFERENCES FOR POINTS IN HEADNOTES

[1–5] 38 Am Jur, Municipal Corporations § 571 *et seq.*
Municipal immunity from liability for torts. 60 ALR2d 1198.

caused by a natural or artificial condition to others privileged to enter for a public or private purpose, irrespective of the owner's consent, where the owner knows others are likely to enter, that the known condition involves an unreasonable risk which they are not likely to discover and yet the owner fails to exercise reasonable care to make the condition reasonably safe or warn them of the condition and risk involved.

5. SAME—WATER FILTRATION PLANT—BOAT RAMP—DANGEROUS CONDITION OF PREMISES.

Fact questions were presented for consideration of jury as to whether city had failed to warn plaintiff's decedents, 2 sisters 12 and 15 years of age, that a dangerous undertow caused by the passage of ships and in failing to warn of the existence of a drop off along the river bottom, when evidence is construed in the light most favorable to the plaintiff, and as to whether premises used for city water system filtration plant and boat ramp was used in a governmental or proprietary capacity under record presented.

DETHMERS and KELLY, JJ., dissenting.

Appeal from St. Clair; Kane (Edward T.), J. Submitted February 5, 1964. (Calendar Nos. 38, 39, Docket Nos. 49,870, 49,871. Decided June 1, 1964.

Consolidated cases by Richard Carlisi, administrator of the estates of Theresa and Frances Carlisi, against City of Marysville, a municipal corporation, for damages because of death of girls by drowning. Judgments for defendant *non obstante veredicto*. Plaintiff appeals. Reversed and judgments ordered entered on verdicts.

*Gussin, Weinstein & Kroll,* for plaintiff.

*Bush, Luce & Henderson* (*Robert James Henderson,* of counsel), for defendant.

DETHMERS, J. (*dissenting*). Legal availability of the defense of governmental immunity from suit for damages resulting from the torts of a city's agents

and employees is the question before us. Plaintiff appeals from judgments *non obstante veredicto* against him, granted on the grounds of such immunity after jury verdicts in his favor.

Plaintiff's decedents in these 2 combined cases were his daughters, 12 and 15 years old, respectively, at the time they were drowned on or adjacent to property of defendant city. The property, a city park, fronted on the St. Clair river. On a portion of it, near the river, is located defendant's water filtration plant. About 20 feet from and between the plant and the river is a concrete breakwall built to prevent erosion of land. Next to that is a dock that juts out into the water a considerable distance. When ships pass the water rushes out from shore, causing an undertow, and then rushes back again, swirling or eddying around the dock area. The water then is quite turbulent at the end of the dock. There is a considerable drop off on the river bottom some distance waterward from the breakwall. There had been a "no swimming" sign in the area, but on the day in question it was down for repairs. The defendant sells water from this plant to its citizens for profit and to industry at double the rates to its citizens. Also on this property is a boat-launching ramp which, by arrangement with defendant, is operated by the American Legion, without payment by it to defendant for the privilege. The Legion charges $1 for use of the ramp by nonresidents of defendant city, but use is free to residents. The Legion enjoys a substantial income therefrom, which it uses for maintenance and improvement of the boat-launching facilities and for other purposes of its own.

Plaintiff's decedents walked behind the filtration plant on the river side, jumped off the breakwall and waded into the river. A ship was passing nearby. When about 10 feet from the breakwall one of

the girls screamed that she was being pulled out. The other went to her rescue but also was carried out when about 20 feet from the breakwall. Both were drowned.

Plaintiff charged the drownings to be due to undertow created by the passage of the ship, unusual action of returning waves because of presence of the dock, and to lack of warning by defendant of the danger of swimming because of the drop off in the river bottom and the wave action from passing ships and to permitting the public to swim there when defendant knew of the dangers.

The drownings occurred on August 4, 1957, thus antedating the September 22, 1961, date of decision in *Williams* v. *City of Detroit,* 364 Mich 231, so that, for whatever reason, the defense of governmental immunity applies if the case is based on negligence of agents or employees of defendant city in the performance of a governmental function. Defendant's maintenance of a public park is a governmental function. *Heino* v. *City of Grand Rapids,* 202 Mich 363 (LRA1918F, 528); *Royston* v. *City of Charlotte,* 278 Mich 255. Accordingly, plaintiff urges that a proprietary function of defendant is here involved, to which the defense is not applicable. Plaintiff's reliance is placed on the presence in the park of the water filtration plant and the boat-launching ramp, both operated for profit.

Construed in the light most favorable to plaintiff, there is no evidence of the slightest causal connection or relationship between the defendant's proprietary function, if any, and the drownings. The decedents, with others, were in the park for a picnic and swimming, not for business or any activity relating to the water filtration plant or the boat-launching ramp. The injuries did not result from the operation of those 2 functions, nor were plaintiffs in the park because of them. If defendant

was guilty of negligence which was a probable cause of the injuries by failing to have the "no swimming" sign up or to give warning of existing dangers, it had to do with the governmental function of maintaining a public park, not with the so-called proprietary functions.

Next, it is plaintiff's contention that defendant waived the immunity defense by purchase of a liability insurance policy, protecting it against personal injury claims, which contained the following provisions:

"It is agreed that * * * Marysville Post No. 449, American Legion, hereby added to this policy as an additional insured.

"The coverage provided for * * * American Legion shall be limited to coverage for liability incurred as a direct result of its operation of the 'Marysville dock area.' "

"It is agreed that in defense of suits against the insured the company, if requested by the insured in writing, will not interpose as a defense the immunity of the insured from tort liability."

In *Podvin* v. *St. Joseph Hospital,* 369 Mich 65, 67, this Court said:

"A clear majority of the Court stands against contention that a tort-feasor immune from liability at common law waives such immunity by purchasing and maintaining liability insurance."

See, also, *Stevens* v. *City of St. Clair Shores,* 366 Mich 341, and *Sayers* v. *School District No. 1,* 366 Mich 217. The purchase of the liability insurance, in and of itself, does not constitute a waiver of the defense by the city. Is the answer otherwise in the instant case because of the provision in the policy that in the defense of suits against defendant city the insurance company will not interpose the defense

of immunity if requested by defendant city, in writing, not to do so?

In support of his insistence that the answer to the last above question should be in the affirmative plaintiff cites *Marshall* v. *City of Green Bay,* 18 Wis 2d 496 (118 NW2d 715). In that case the insurance policy, in contrast to that in the case at bar, provided that "the company will not avail itself of the defense that the city is not liable because of the performance of governmental functions." The majority of the Wisconsin court held that this agreement was a waiver of governmental immunity by the city, agreed to by the insurer, for the benefit of third-party beneficiaries; that is, claimants against the city. The court said, however, (p 502), that it was not holding that a municipality waives its immunity by taking out a policy which does not contain the agreement by the insurance company to refrain from raising the defense. In the case at bar the insurer has not agreed to refrain absolutely, but only when requested in writing by the city to do so. Even under the Wisconsin holding, the condition or agreement there held to constitute the waiver could not come into being in the instant case until defendant city would request in writing that the insurance company refrain from raising the defense of immunity. That is not shown to have occurred here.

Plaintiff urges that the provision of the insurance policy, making it optional with defendant whether or not the insurance company may raise the immunity defense, places it in the hands of the city to discriminate between persons asserting tort claims against it. This, says plaintiff, amounts, in cases where the city does not request the insurer to waive the defense, to denial by defendant of equal protection of the laws. If, as plaintiff contends, the policy provision is thus violative of Federal and State constitutional guarantees and must, for that

reason, fall, it avails the plaintiff nothing. No absolute agreement to refrain from raising the defense, as in the Wisconsin case, was effected here. If the insurer's agreement to refrain from raising it when so requested in writing by the insured suffers from the noted constitutional infirmity, nothing is left of the entire waiver provision and theory in this case.

The judgments should be affirmed. Costs to defendant.

Kelly, J., concurred with Dethmers, J.

Adams, J. This case arises out of the drowning August 4, 1957, of 2 girls, 12 and 15 years old, in the St. Clair river adjacent to land owned by the city of Marysville and used by it as a park and for the operation of a water filtration plant.

After jury verdicts in favor of the plaintiff, the circuit court granted motions for judgments notwithstanding the verdicts, holding that as a matter of law there was no causal connection between the operation of the water filtration plant and the drownings, and that any possible negligence in failing to warn of the dangers claimed was incident to the governmental function of operating and maintaining the park, to which claim of negligence the defense of governmental immunity was properly asserted.

The question on appeal is whether the duty to warn the Carlisi girls of the claimed dangers, known by the city to exist, arose by virtue of possession of the land in a proprietary as opposed to a governmental capacity.

The land adjacent to the drownings was undisputably used both as a park, which is a governmental function, *Heino* v. *City of Grand Rapids,* 202 Mich

363 (LRA1918F, 528) ; *Royston* v. *City of Charlotte,* 278 Mich 255, and for a water filtration plant operated for profit, which is a proprietary function, *Andrews* v. *City of South Haven,* 187 Mich 294 (LRA 1916A, 908, Ann Cas 1918B, 100) ; *Taber* v. *City of Benton Harbor,* 280 Mich 522; *City of Bay City* v. *State Board of Tax Administration,* 292 Mich 241; *Kalamazoo Municipal Utilities Association* v. *City of Kalamazoo,* 345 Mich 318 (61 ALR2d 583).

This Court has considered the question of determining the particular capacity in which a defendant city was acting where there was involved a dual use of property. *Matthews* v. *Detroit,* 291 Mich 161; *Lisiecki* v. *Detroit Wayne Joint Building Authority,* 364 Mich 565; *Munson* v. *County of Menominee,* 371 Mich 504. The rule from these cases is that if the object and purpose of the legislature in conferral of the powers involved is for public purposes exclusively, then the municipality is deemed to be acting in a governmental capacity. However, if the grant of power is for purposes of private advantage and emolument, then even though the public derives some benefit therefrom the municipality stands on the same footing as any private individual without the shield of governmental immunity.

Since these causes of action accrued on August 4, 1957, before the holding in *Williams* v. *City of Detroit,* 364 Mich 231, abolishing prospectively the judicial doctrine of governmental immunity from liability for ordinary torts, the question therefore becomes what was the real legislative objective and purpose involved in the use of this land?

The entire situation both with regard to the use for park purposes and for a water filtration plant can best be seen from an examination of an aerial photograph, defendant's exhibit A. Two portions of land are involved. One small parcel is bounded on the east by the St. Clair river, on the north by

a creek, on the west by a road known as River road, running parallel to and approximately 100 feet west of the river, and on the south by a portion of fence located south of 3 buildings described below and extending toward the river where a boat launching ramp is located. The distance from the boat ramp at the south to the creek at the north is about 120 feet. This is the parcel of land on which the city built a water filtration plant in 1937. The plant consists of a water filtration building, a clear water reservoir with a capacity of 750,000 gallons (buried 6 inches under the surface of the earth between the water filtration building and the creek), and a coagulation basin located south of the water filtration building. A small service pumping building is located over the southwest corner of the clear water reservoir, and a third building is located south of the water filtration building over the coagulation basin. Except for these 3 buildings which are all a part of the water plant, there are no other buildings on this parcel. Between 1940 and 1945, as a security measure, all of these facilities were enclosed by a fence along the boundaries mentioned. After the war most of the fence was removed, and a breakwall along the river constructed to prevent erosion of the land. In 1954 the water filtration building was enlarged 1/3 by an addition to the east so that its eastern wall is only 20 feet from the water's edge. On the edge of the breakwall is a sidewalk running along the water's edge. Three pipes run from the filtration plant to the water: a 24-inch intake pipe extending 570 feet into the channel of the river, a drain from the settling basin, and a wash water line. The wash water line, or rinsing pipe from the filtration plant had to be enclosed at the water's edge by a rectangular fence to protect children wading in that area from falling into a 3 to 4-foot hole which formed from the discharge water. Taking into ac-

count the area used for the submerged clear water reservoir, it is apparent that practically the entire area was being used by the city for water plant purposes.

The surface of the land adjacent to the buildings is grassy and used by persons as a vantage point from which to view activity on the river.

The second parcel of land, at least 20 times larger than the first parcel, is located west of River road. On this second parcel are located toilet facilities, extensive picnic facilities, baseball and softball diamonds, tennis courts, horseshoe courts, a band shell at which dancing is held, a small concession stand, a circular quarter-mile track, and a parking lot, many of which facilities are apparent on defendant's exhibit A.

Although the city knew large numbers of persons used the water area adjacent to the plant for wading and swimming, the city *did not* make swimming and wading a part of the park activities. The city manager testified that the city attempted to discourage swimming and wading: (1) by posting signs indicating "You Swim at Your Own Risk," (2) by failing to rope off any area for swimming, (3) by failing to provide any life guard, (4) by not advertising the area as a public beach, (5) by not providing any bath house or changing facility, and (6) by failing to provide janitor service or anyone to clean the bottom of the river.

It is undisputed that on August 4, 1957, a "No Swimming" sign which had been posted near the creek was being repaired. On that date no warning signs or signs prohibiting swimming or wading were posted. The Carlisi girls entered the water immediately to the rear of the water filtration building. It was their first excursion to the park and their first visit to the water area where they met their deaths.

From this detailed recitation of the facts it must be concluded that the primary legislative objective and purpose in designating the first parcel of land as the site for the water filtration complex, operated for profit, was for purposes of private advantage and emolument. The persons who enjoyed the adjacent grassy area as a vantage point to view river activity derived an incidental benefit.

The wading and swimming was neither a park activity nor a water plant activity. The only affirmative action taken for the safety of these persons was by enclosing with a fence a hole on the river bottom caused by water discharged from a water filtration plant pipe. The fact that visitors to the park made swimming a part of their park use does not make such use a governmental function, prohibited on days when the "No Swimming" sign was posted and discouraged at other times. In spite of swimming, wading, and viewing passing ships, the basic and principal use of the first parcel of land was by the city in a proprietary capacity.

The city stands as an individual possessor of land with the duties imposed by law. The Restatement of Torts, § 345, announces the rule applicable here:

"A possessor of land is subject to liability for bodily harm caused by a natural or artificial condition thereon to others who are privileged to enter the land for a public or private purpose, irrespective of his consent, if he

"(a) knows that they are upon the land or are likely to enter it in the exercise of their privilege, and

"(b) knows of the condition and realizes that it involves an unreasonable risk to them and has no reason to believe that they will discover the condition or realize the risk, and

"(c) fails to exercise reasonable care

(i) to make the condition reasonably safe or

(ii) to warn them of the condition and the risk involved therein."

Plaintiff claimed, in part, that the city was negligent in failing to warn the Carlisi girls of a dangerous undertow caused by the passage of ships, and in failing to warn of the existence of a drop off along the river bottom.

Construing the evidence in the light most favorable to the plaintiff, a fact question was raised as to whether the failure to warn the Carlisi girls of dangers known to exist may have contributed to their deaths.

The question of proprietary versus governmental capacity was submitted to the jury, as was the question of failure to warn of dangers. The jury resolved these questions by general verdicts for the plaintiff.

The judgments notwithstanding the verdicts of the jury should be reversed and judgments entered in accordance with the verdicts.

KAVANAGH, C. J., and SOURIS, SMITH, and O'HARA, JJ., concurred with ADAMS, J.

BLACK, J., did not sit.