Shirley A. THOMAS as the Administratrix of the Estate of Donald E. Thomas, Plaintiff,

v.

POTOMAC ELECTRIC POWER COMPANY

and

District of Columbia, Defendants.

John F. WYNN, Jr., Plaintiff,

v.

POTOMAC ELECTRIC POWER COMPANY

and

District of Columbia, Defendants.

Civ. A. Nos. 1955–61, 330–62.

United States District Court
District of Columbia.

April 18, 1967.

Henry Lincoln Johnson, Jr., Washington, D. C., for plaintiff Thomas.

I. Irwin Bolotin, Washington, D. C., for plaintiff Wynn.

Thomas A. Flannery and Stephen A. Trimble, Washington, D. C., for defendant Potomac Electric Power Co.

Andrew G. Conlyn, Assistant Corporation Counsel, for defendant District of Columbia.

HOLTZOFF, Judge.

## OPINION

Two lifeguards, Donald E. Thomas and John F. Wynn, Jr., employed at a public swimming pool in Washington, D. C., known as the Banneker Swimming Pool, received an electric shock while

trying to assist a swimmer who had been similarly stricken. As a result Thomas died, while Wynn sustained personal injuries. Both Thomas and Wynn were part-time employees of a corporation known as Government Services, Inc., and both the Thomas estate and Wynn received workmen's compensation accordingly.[1]

An action for damages for wrongful death was brought in behalf of the Thomas estate and another in behalf of Wynn for personal injuries, against Potomac Electric Power Company, a public utility that supplies electric current in the city of Washington, and against the District of Columbia. These actions are so-called "third-party actions" predicated on negligence.[2] The two cases were consolidated for trial. At the close of the trial, the Court directed a verdict in favor of defendant Potomac Electric Power Company, as the evidence showed that the power company supplied electricity only as far as the customer's meter, while the customer installed and maintained his own equipment from that point. The cases as against the District of Columbia were submitted to the jury. The jury returned a verdict in favor of the administratrix of the Thomas Estate for $156,225, allocating $95,225 to his widow Shirley A. Thomas, $25,000 to his son Donald E. Thomas, Jr., and $36,000 to his son Martin Thomas;[3] and a verdict in favor of plaintiff Wynn for the sum of $28,000. The cases are now before the Court on motions of the District of Columbia for judgments *non obstante veredicto*.

The salient facts are not in dispute. At the time of the tragic accident, which occurred on August 1, 1960, there was maintained in Washington, a public recreation establishment known as the Banneker Recreation Center. It was located on land belonging to the United States. It consisted of a playing field, as well as a swimming pool and building, both of which had been constructed by the National Capital Parks Division of the National Park Service of the Department of the Interior. The Recreation Board of the District of Columbia, an agency of the local Government, conducted a large number of activities at the Center,[4] such as athletic games on the playing field, and classes of various types open to the public on the upper floor of the building adjacent to the swimming pool. The lower floor was used as a bathhouse for the patrons of the pool.

The operation of the swimming pool was divided between the Recreation Board of the District of Columbia, and the National Capital Parks. The latter delegated its part of the activity to a concessionaire, a non-profit private corporation entitled Government Services, Inc. During the morning hours the pool was operated by the District of Columbia. Free swimming instruction was given to all who desired it. In the afternoon it was conducted purely as a swimming pool by Government Services, Inc. The lifeguards, who also acted as swimming instructors during the mornings, were hired by the Recreation Board and were paid by it for their morning work. They received compensation for their afternoon service from Government Services, Inc. Thus, each lifeguard received two pay checks on each pay day. The maintenance employees, such as the janitor and others, were hired by Government Services, Inc. The electrical equipment and wiring at the Center, including underwater lights at the pool, had been installed by National Capital Parks and were maintained by that agency or its concessionaire.

1. The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., constitutes the Workmen's Compensation Law of the District of Columbia, D.C.Code § 36–501.

2. 33 U.S.C. § 933.

3. D.C.Code § 16–2701 requires such allocation.

4. The powers of the Recreation Board are enumerated in D.C.Code § 8–210.

On August 1, 1960, at about 3:00 p.m., an electric current passed through the water in the swimming pool and shocked a boy, who was swimming at the time. The accident resulted in his death. Lifeguard Thomas jumped in to save the boy, but unfortunately met the same fate. Lifeguard Wynn jumped in after the other two in order to render assistance. He also received a severe shock, but fortunately was rescued and after a few days in the hospital, gradually regained his health.

The cause of the accident was established by uncontradicted evidence given by three electrical engineers. The electric current came from the underwater lighting system at the pool. The original construction of the equipment and wiring were shown to have been improper and deficient, and to have failed to comply with accepted standards. They had been installed under contract with the National Capital Parks by a small electrical concern that is now defunct. The wire leading to the circuit breaker was too small to conduct a current that was sufficiently strong to operate the circuit breaker.[5] The rubber hose surrounding the electrical wiring had rotted in part by a gradual process of deterioration, which was estimated to have taken 2 to 5 years; seepage took place and one of the fixtures became partially filled with water; the insulation having partially worn off, a short circuit occurred; two wires, including the ground wire, were burned; the circuit breaker could not be operated and the electric current was siphoned off into the water. The result was that human beings who were in the path of the current, received an electric shock.

It is clear that the individuals who actively participated in the original installation and the electrician who under contract with National Capital Parks occasionally inspected the wiring, were guilty of culpable negligence in a high degree.[6] They exhibited either ignorance, incompetence, or indifference. It is strange, too, in the light of the known dangers of underwater electric systems, that neither the District of Columbia nor the National Capital Parks exercised any supervision or arranged for frequent inspections by an experienced and trained electrical engineer. The original installation had been left to a small contractor and subsequent occasional maintenance to an electrician. Had these actions been brought against a private individual or corporation, an instruction to the jury on the right to impose punitive damages would probably have been appropriate.

There are a number of legal objections, however, raised by the Corporation Counsel in behalf of the District of Columbia, which he contends preclude liability from being imposed on the District. These objections will now be considered.

■ First, the fundamental point interposed by the District of Columbia, is that the operation of a swimming pool by a municipality constitutes the performance of a governmental rather than a proprietary function and that, therefore, a municipality is not liable for negligence in conducting such activities. It must be accepted as a fact that the outmoded doctrine differentiating between a governmental and a proprietary activity of a municipality and conferring immunity from suit in connection with a function of the former category still persists in the District of Columbia, and can be abrogated only by legislation. The principle is not favored, however, and is not extended beyond its original

5. Specifically, the circuit breaker had a power of 35 amperes. It was connected with a wire tap of No. 16 wire, which according to the testimony was too light to transmit a current strong enough to trip a circuit breaker of more than 10 amperes. Wire No. 12 size should have been used instead. The sizes of electric wires are in reverse to their magnitude.

6. There was evidence to the effect that the electrician inspected the wiring system 3 days before the accident. He evidently failed to detect the deterioration. He was deceased at the time of the trial.

scope. It should not be expanded so as to apply to activities that have not as yet been held to be governmental.

This Court had occasion to discuss this subject in Calomeris v. District of Columbia, 125 F.Supp. 266, in which, on the basis of a prior decision of the Court of Appeals, it was held that the maintenance and operation of a municipal hospital is a governmental function. Accordingly, in that case the motion of the defendant District of Columbia to dismiss the complaint was granted. This Court made the following comments (p. 267):

> "Government immunity from suit is an obsolescent and dying doctrine. The United States waived its immunity to suit in tort by the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b). Although the District of Columbia is Federal area and its government has been created by the Congress, nevertheless, for some reason the District of Columbia, either intentionally or inadvertently, was not included in that statute. Consequently, such immunity as the District of Columbia previously possessed still persists." [7]

The Court of Appeals affirmed this decision, 96 U.S.App.D.C. 364, 226 F.2d 266, but in doing so it approved the criticism of this Court concerning the basic theory. The opinion of the Court of Appeals contains the following remarks (pp. 365, 366, 226 F.2d p. 267):

> "District Judge Holtzoff disposed of the matter with a careful opinion, concluding that the court 'much to its regret' had no alternative but to grant the motion.
>
> \*  \*  \*  \*  \*
>
> "We agree with Judge Holtzoff that the defense of governmental function to a complaint for negligence, mistreatment or malpractice is 'an obsolescent and dying doctrine', but we also

agree with him that since it is a phase of government immunity Congress alone can replace it. We join in his suggestion that the attention of the Congress might well be directed to it. Congress did not include the District of Columbia Government in the Federal Tort Claims Act."

The latest expressions of the Court of Appeals concerning this topic are found in Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 337 F.2d 152, in which the Court took a salutary step in the direction of departing from the original doctrine of governmental functions. It may be said in passing that the opinion of this Court in the *Calomeris* case supra, is quoted by the Court of Appeals in a footnote in the *Elgin* case.

There is no binding authority in the District of Columbia on the question whether the operation of a public swimming pool constitutes a governmental or a proprietary function. Assistance may be found in cases decided in other jurisdictions. In connection with the examination and analysis of the authorities, it must be borne in mind that we are not dealing with a swimming pool connected with a school and, therefore, constituting a part of the school system; or with a swimming pool operated in a public park in connection with the park system. The narrow question is whether a public swimming pool operated by a municipality as an independent facility, constitutes the performance of a governmental function.

Without attempting to exhaust the authorities, the following States, among others, have held that such an activity constitutes a proprietary rather than a governmental function: Montana, Felton v. City of Great Falls, 118 Mont. 586, 169 P.2d 229; New Jersey, Weeks v. City of Newark, 62 N.J.Super. 166, 162 A.2d 314; Ohio, Hack v. City of

---

7. It is incongruous, for example, that a person injured as a result of the negligence of an employee of a hospital maintained by the Federal Government has a good cause of action against the United States under the Federal Tort Claims Act, while a person injured as a result of the negligence of an employee of a hospital maintained by the Government of the District of Columbia has no recourse against the District.

Salem, 174 Ohio St. 383, 189 N.E.2d 857; Pennsylvania, De Simone v. City of Philadelphia, 380 Pa. 137, 110 A.2d 431; South Dakota, Orrison v. City of Rapid City, 76 S.D. 145, 74 N.W.2d 489; Virginia, Hoggard v. City of Richmond, 172 Va. 145, 200 S.E. 610, 615, 120 A.L.R. 1368; and West Virginia, Ashworth v. City of Clarksburg, 118 W.Va. 476, 190 S.E. 763.

This doctrine was succinctly summarized by a New Jersey Court in Weeks v. City of Newark, supra, 162 A.2d at p. 322:

"The operation of a swimming pool is an activity which a municipality provides for its citizens more as a matter of local convenience than in the exercise of some duty discharged on behalf of the State with consequent benefits accruing to the State as a whole. It is a service which could just as well be provided by a private corporation, and very often is."

The opposite conclusion has been reached in the following States: Iowa, Mocha v. City of Cedar Rapids, 204 Iowa 51, 214 N.W. 587; Kansas, Sroufe v. Garden City, 148 Kan. 874, 84 P.2d 845; Massachusetts, Bolster v. City of Lawrence, 225 Mass. 387, 114 N.E. 722, L.R.A.1917B, 1285; New Hampshire, Harkinson v. City of Manchester, 90 N. H. 554, 5 A.2d 721; and Tennessee, Vaughn v. City of Alcoa, 194 Tenn. 449, 251 S.W.2d 304.

■■ In the light of the preceding discussion concerning the modern trend to limit and restrict, rather than expand, the doctrine of governmental immunity to suit in tort, as well as because of new activities that are being undertaken from time to time by governmental bodies, this Court prefers and adopts the view that the operation of a public swimming pool by a municipality is a proprietary rather than a governmental function. Consequently the objection of the District of Columbia on this score is overruled.

Counsel for the District of Columbia relies on the case of Tillman v. District of Columbia, 58 App.D.C. 242, 29 F.2d 442. That case, however, is clearly distinguishable. It involved the temporary installation of a water sprinkler or shower on a public street for the use of children of the neighborhood in hot weather. There is no analogy between this state of facts and the operation of a permanent public swimming pool. Counsel points to the fact, however, that the opinion in the *Tillman* case cites a Massachusetts case, Bolster v. City of Lawrence, supra; and a Michigan case, Heino v. City of Grand Rapids, 202 Mich. 363, 168 N.W. 512, L.R.A.1918F, 528 both holding that the maintenance and operation of a swimming pool is a governmental function. It does not necessarily follow that by relying on these two decisions the Court of Appeals for the District of Columbia adopted their rulings *in toto*. It may be observed that the Massachusetts case was decided exactly 50 years ago, before the present tendency to abolish or at least limit governmental immunity to suit in tort, had gained its momentum; and as concerns the Michigan case, the doctrine of governmental immunity as to municipalities was completely overruled and abandoned in that State in 1961, Williams v. City of Detroit, 364 Mich. 231, 111 N.W.2d 1.

■ The next objection interposed in behalf of the District of Columbia is that the swimming pool was operated both by the District of Columbia and in behalf of the United States at different hours of the day, and that the District did not maintain or control the electric lighting system at the pool. The facility was located on land owned by the United States and the electrical equipment had been installed and was maintained by the United States or by its contractor or concessionaire. The Recreation Board of the District of Columbia and its employees had no connection with the maintenance of the pool and persons concerned with that phase of the work were employees either of the United States or of its concessionaire. The Court is of the opinion that this distinction is of no consequence as a matter of

law. Any person, be it a natural person, a corporation, or a governmental agency that maintains or operates an establishment which it invites the public to utilize, is under a duty to use due diligence and reasonable care to keep the premises reasonably safe for invitees. O'Dwyer v. Northern Market Co., 24 App.D.C. 81, 87; Watford by Johnston v. Evening Star Newspaper Co., 93 U.S.App.D.C. 260, 263, 211 F.2d 31. It is immaterial whether the person has title to the property, or authority to use it, or has control, or ability to employ adequate safety measures.

There are numerous cases applying this theory in various situations. Specifically, it has been invoked in connection with a swimming pool in an action for personal injuries sustained by a patron as a result of slipping on a defective stair pad (New Jersey) Benton v. Young Men's Christian Ass'n of Westfield, 27 N.J. 67, 141 A.2d 298.

A person who invites the public to premises operated by him may not delegate to others or rely on others to perform the duty of maintaining the place in a reasonably safe condition, and relieve himself of the obligation in that manner. Consequently, the Court concludes that the District of Columbia was under a duty to make certain that due diligence was used to keep the pool in a reasonably safe condition and that failure to perform this duty creates liability on its part.[8]

It is next urged in behalf of the District of Columbia that since Thomas and Wynn were employees of the District of Columbia, no action for damages may be maintained against the District, based on injuries sustained in the course of their employment. Counsel points to the provision of the District of Columbia Code which extends to employees of the government of the District of Columbia the provisions of the Federal Employees' Compensation Act, D.C.Code § 1–311. A comprehensive scheme for the payment of compensation for injuries or death suffered by government employees within the scope of their employment has been established by Congress and has been construed to be an exclusive remedy, 5 U.S.C. § 8101 et seq. formerly § 751 et seq. It follows that no action lies against the District of Columbia for the death or injuries occurring in the course of employment in the case of District employees. The difficulty with this argument in this instance is, however, that Thomas and Wynn were only part-time employees of the District of Columbia, as well as part-time employees of Government Services, Inc., which, it will be remembered, is a private corporation. At the time of the accident involved in this case, they were performing services as employees of the latter and not as employees of the District of Columbia. It is understood that no claim has been made in their behalf against the District for compensation under the Act to which reference has been made. This objection is hence overruled.

Finally it is urged that the actions must fail because the required statutory notice was not given to the District of Columbia. In this connection, the Corporation Counsel relies on the provision of D.C.Code § 12–208, to the effect that no action may be maintained against the District of Columbia for unliquidated damages to person or property unless the claimant gives notice in writing to the Commissioners of the District of Columbia within 6 months after the injury or damages were sustained. Admittedly no such notices were served in this instance. The statute, however, adds a proviso reading as follows:

" * * * a report in writing by the Metropolitan police department, in regular course of duty, shall be re-

---

8. The evidence leads to the conclusion that there was also a cause of action against the United States under the Federal Tort Claims Act. A count comprising such a claim probably could have been included in the complaint. This course would have avoided most of the problems that have been discussed in this opinion, in view of the waiver by the United States of its sovereign immunity against suit in tort.

garded as a sufficient notice under the above provision."

■ The evidence shows that a detective of the Homicide Squad of the Metropolitan Police Department immediately and thoroughly investigated this accident, and promptly made a full detailed official report concerning it. Consequently, there has been compliance with the requirements of this statute.

The motions for judgments *non obstante veredicto* are denied.

There is still another important subject to be considered, namely, the amount of damages awarded in the two cases. After the verdict was returned and the jury was discharged, the Court made the following statement in open court:

"The Court will give serious consideration to any motion that the District of Columbia may care to make based on the contention that the verdict is excessive, because the Court is inclined to the view, at first blush that both verdicts are excessive and unwarranted by the evidence. However, I am not deciding the matter now, but I will be willing to give consideration to this motion as to both parties." (Tr. p. 540)

■ Ordinarily, the question whether the amount of damages awarded by the jury is excessive may be considered only as a ground for a new trial, and if such an objection is sustained, the usual practice is to require the plaintiff to consent to a remittitur as a condition for a denial of a motion for a new trial. In this instance, however, no motion for a new trial was filed. The only application presented in behalf of the District of Columbia are motions for judgments *non obstante veredicto*. The Corporation Counsel did not even take advantage of the provision of Rule 50(b) of the Federal Rules of Civil Procedure, to the effect that a motion for a new trial may be joined with a motion for judgment *non obstante veredicto*, or a new trial may be prayed for in the alternative. The Assistant Corporation Counsel stated in open court that this omission was not

an inadvertence or error, but that after consideration and conferences in the office of the Corporation Counsel, it was determined to stand solely on the motions for judgments *non obstante veredicto*.

Rule 59(d) of the Federal Rules of Civil Procedure empowers the Court to grant a motion for a new trial for a reason not specified in the motion, but obviously there must be a motion as a basis for such a ruling. The Court is also authorized by the Rule to order a new trial *sua sponte* not later than 10 days after entry of judgment. The Court did not take any such step, however, because it assumed that in view of the suggestion announced from the bench, action would be taken by counsel.

■ In the light of these considerations, the verdict of $28,000 in favor of Wynn must stand. The Court deems it inappropriate to discuss the question whether it is excessive, irrespective of its views on this point.

A different situation is presented in connection with the damages of $156,225 awarded to the Thomas estate.

■ The District of Columbia counterpart of Lord Campbell's Act, D.C. Code § 16–2701, Supp. V. 1966, contains the following unique provision:

"If, in a particular case, the verdict is deemed excessive the trial judge or the United States Court of Appeals for the District of Columbia Circuit, on appeal of the cause, may order a reduction of the verdict."

This provision is broad enough to empower the trial Court to act *sua sponte* in the exercise of its sound discretion. There is no time limitation. It also authorizes the Court to reduce the amount of damages directly and to modify the judgment accordingly without the necessity of requiring a remittitur as a condition for denial of a motion for a new trial. When this statute was mentioned on the argument on the post-trial motions, the Assistant Corporation Counsel indicated that he had the statute in mind and suggested that his office would leave

the matter in the hands of the Court without expressing any views as to what, if any, action should be taken under this provision.

As has been heretofore stated, the verdict in favor of the administratrix of the estate of Donald E. Thomas as damages for his death, was for $156,225. Of this amount $1225 represents funeral expenses. Consequently the damages awarded for the death itself were $155,-000.

The law of the District of Columbia, as did the original Lord Campbell's Act, limits damages for wrongful death to the pecuniary loss sustained by persons who were dependent on the deceased or to whom the deceased made or might be reasonably expected to make contributions. The salient facts bearing on the amount of damages in the Thomas case are as follows. The deceased Donald E. Thomas was born on July 31, 1934. He was, therefore, exactly 26 years old at the time of his death. His life expectancy was 40.4 years. His wife, Shirley Thomas, was 27 years old. The couple had two sons: Donald Thomas, Jr., 8 years old; and Martin Thomas, two years old. During the preceding June the deceased had graduated from Teachers' College and was planning to enter the District of Columbia School System the following fall as a teacher.

To establish some basis for a determination of the amount of damages, plaintiff's counsel followed the course frequently pursued in such cases and called an expert statistician as a witness. The latter testified that his best estimate of the present value of the total earnings that the deceased might have been expected to receive during his entire working life expectancy was $155,000. He then explained the method used by him in arriving at this result. It was assumed by him that the working life expectancy of the deceased was 36 years; that the salary of a teacher in the District of Columbia at the time of his death was $5,000 a year; that on the average his salary would have been likely to increase by about 3% annually; that $1,-

000 a year should be deducted from his annual salary for his own maintenance and his other personal expenses; and that some allowance, the witness did not say how much, should be made for the possibility of his death prior to the end of his working life expectancy. He then stated that he took the aggregate amount of earnings computed by this method and reduced it to present worth, discounting the total at the rate of 4% per annum. Unfortunately, counsel did not interrogate the witness further and did not request him to give his computations, step by step in detail, but confined his testimony, as stated, to a statement of the ultimate estimte and an explanation of the general method used to reach it. Failure to make the elaboration greatly weakens the probative weight of the testimony, since no means are presented for checking the detailed calculation made by the witness.

For the time being, we shall assume *arguendo* that the computation made by the witness was mathematically correct on the basis of the method used by him. Actuarial testimony as to possible or probable future earnings of the deceased, and the reduction of the aggregate amount to present worth, is admissible and is generally presented in cases of wrongful death of an adult breadwinner of a family. It is, however, far from conclusive. Such evidence is only the starting point and not the terminus of the inquiry. It may not be adopted at its face value as the sole basis for the determination of damages for death. Especially is this true in a case where the deceased had not as yet established himself in a specific occupation in which he was earning a set income and was likely to continue. It may be otherwise in some cases in which the deceased had attained a permanent status in his calling and was receiving a salary that was permanently assured. In some cases of this type, the actuarial testimony, if detailed enough, may even be accepted as final without consideration of other factors. Here, however, the deceased only planned to enter the teach-

ing profession, but had not as yet reached that point. There is always a question under such circumstances whether the person would be successful in his chosen line of endeavor.

■■■ The vicissitudes of fortune, the buffetings of fate, and the uncertainties of life and health, must invariably be considered. Fairness and justice require that the amount reached on an actuarial basis be reasonably reduced in the light of these additional factors. Otherwise, damages would be awarded on the basis of an assumed success in one's occupation and a guaranteed income. In the case at bar the verdict would give greater financial security to the family than it would have had if the deceased had lived.

An illuminating discussion of this topic is contained in a recent decision of the Supreme Court of Iowa, Brophy v. Iowa-Illinois Gas and Electric Company, 254 Iowa 895, 119 N.W.2d 865, 866:

> "No evidence is possible of the time which deceased would have lived but for the injury complained of. Had he avoided this injury, death may have met him the next day, week, or year in some other form. In business he might have become a phenomenal success and accumulated millions, or he might have lived to old age and died a pauper. From a man of good habits, prudence and industry, he might have become a spendthrift or a tramp, or if a man of dissolute habits he might have reformed into an efficient and prosperous citizen."

In O'Connor v. United States, 269 F.2d 578, 582, a decision of the Court of Appeals for the Second Circuit, the Court made the following statements as a helpful guide to the elements that must be considered and weighed in determining the amount of damages in a wrongful death case:

> "What the decedent was actually earning at the time of his death is a major factor in determining earning capacity. It is also proper to consider the length of time he worked for his employer (in this case four months);

the prospect of his retaining his job and the opportunities for other employment; his chances for future promotion or demotion, his and his wife's and child's probable life expectancies, his physical condition, habits and the ordinary vicissitudes of life."

In that case the deceased was 36 years old when he was killed, and had a life expectancy of 36.4 years. He was earning $391.00 a month, as a field engineer for a well-established, large business concern. He left a widow and one child. An award of damages for wrongful death in the sum of $150,000 was reduced by the Court to $90,000 by means of a remittitur imposed as a condition of affirmance of the judgment of the District Court. It is interesting to observe that the Court was of the opinion that in making computations, one-third of the income should have been allocated to the personal expenses and support of the deceased, whereas in this instance, the plaintiff's witness deducted only $1,000 a year for that purpose. As heretofore stated, in the case at bar, we are confronted with an additional problem arising out of the fact that the deceased had not yet entered upon any permanent employment and that consequently it is purely speculative to weigh the possibilities of his earning status. This factor adds a weighty element of uncertainty.

■■■ This Court reaches the conclusion that the award made by the jury, which obviously did not take into consideration any of the uncertainties and gave them no weight, is excessive and should be reduced. It may well be that the jury may have been emotionally stirred by the horror of the manner in which the deceased was killed and the inexcusable negligence displayed by individuals who were responsible for the conditions that led to the tragic accident. While such emotions are righteous and commendable, they should not be permitted to influence the verdict. In reducing the amount of damages, it is incumbent on the Court not necessarily to fix a sum that the Court would have awarded, but to decrease the award made by the jury

only to the highest amount that the Court deems to be within the bounds of reason.

Accordingly, the Court will diminish the award of $155,000 to $90,000 and add to it the amount of funeral expenses. In other words, the total amount of damages will be reduced from $156,225 to $91,225. The Court will allocate that amount as follows: to the widow, Shirley A. Thomas $56,225; to the son Donald E. Thomas, Jr. $14,500; and to the son Martin Thomas, $20,500.

Motions of the defendant District of Columbia for judgments *non obstante veredicto* are denied. The award of damages to the plaintiff Shirley A. Thomas, as administratrix is reduced from $156,-225 to $91,225, and allocated as follows: to the widow, Shirley A. Thomas $56,-225; to the son Donald E. Thomas, Jr., $14,500; and to the son Martin Thomas, $20,500, the award to the minors to be paid to guardians to be appointed through the Probate Division of this Court. The judgment in the Thomas case will be modified in accordance with this ruling.

Counsel may submit proposed orders and judgment.