REID, Senior Judge,
concurring in part and dissenting in part:
I fully join Part II of Judge Fisher’s opinion relating to the officers’ liability for compensatory and punitive damages. I also fully join Part III B of Judge Fisher’s opinion concerning the District’s non-liability for punitive damages. However, based on my review of the record and applicable legal principles, I am unable to agree with Part III A of Judge Fisher’s opinion which rejects the jury’s special verdict regarding whether the officers were acting within the scope of their employment, and instead, “conelude[s], as a matter of law, that the officers were not acting within the scope of their employment and that the District of Columbia is not vicariously liable for the award of compensatory damages.” In my view, the trial court properly denied the District’s motions for judgment as a matter of law with respect to the scope of employment issue. I also would reject the District’s main argument that the Bami-deles did not provide proper notice of their claim under D.C.Code § 12-809. Hence I would affirm the jury finding “by a preponderance of the evidence,” that Officers Callahan, Wiedefeld, and Nasr were “acting within the scope of [their] employment with the District of Columbia in furtherance of the District of Columbia’s purposes on February 3, 2007.”
I first address the District’s motions for judgment as a matter of law as to the vicarious liability issue. In Bean v. Gutierrez, 980 A.2d 1090 (D.C.2009), we reiterated that,
judgment as a matter of law is appropriate only where no reasonable person viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party, (citations and internal quotation marks omitted). Moreover, when the case turns on disputed factual issues and credibility determinations, the case is for the jury to deeide[;] [i]f reasonable persons might differ, the issue should be submitted to the jury. Furthermore, in reviewing a motion for [judgment as a matter of law] after a jury verdict, this court applies the same standard as the trial court.
Id. at 1093 (citing Lively v. Flexible Packaging Ass’n, 830 A.2d 874, 886 (D.C.2003) (en banc)).
The majority opinion recognizes that, “[a]s a general rule, whether an employee is acting ‘within the scope of employment’ is a question of fact for the jury; [i]t becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could con- *528 elude that the action was within the scope of the employment.” Boykin v. District of Columbia, 484 A.2d 560, 562 (D.C.1984) (citations omitted). I believe that the trial judge faithfully adhered to the applicable legal standard and principles in allowing the case to go forth to the jury and in declining to grant the District’s post-verdict motion for judgment as a matter of law. The evidence in this case revealed significant differences in the factual accounts by witnesses, and hence, the factual context for determining what occurred at the Szechuan Gallery and whether the officers acted within the scope of their employment was in dispute. I believe that some of the evidence, if credited by the jury (as apparently it was) reveals that reasonable persons might differ as to whether Officers Callahan, Wiedefeld and Nasr were acting within the scope of their employment at the Szechuan, and that reasonable jurors could conclude that they were indeed acting within the scope of their employment.
The majority opinion essentially separates the factual testimony provided by witnesses into two scenarios — one relating to the assault on Officer Wiedefeld and the three unidentified men seated at a table adjacent to the table where the officers were seated, and the other scenario relating to the assault on Mr. Bamidele by the officers. In taking this approach the majority opinion acknowledges that the officers had an intent to carry out their duty as police officers by investigating the assault on Officer Wiedefeld but the opinion asserts that the officers “did not intend to take police action against Mr. and Mrs. Bamidele, nor did the Bamideles become accidentally entangled in the officers’ scuffle with the unidentified men.” Therefore, the opinion states, “as a matter of law, ... the officers were not acting within the scope of their employment and ... the District of Columbia is not vicariously liable for the awards of compensatory damages.”
None of the witnesses provided clear times at which the events unfolded, from the throwing of the objects to the assaults on Officer Wiedefeld and Mr. Bamidele. However, viewed in the light most favorable to the Bamideles, there is testimony on which reasonable jurors could conclude that the incident involving the officers’ investigation of the assault on Officer Wiede-feld and .the assault on Mr. Bamidele, which his wife witnessed, actually were spliced together, and not sharply separated incidents, and that the actions by the officers against Mr. Bamidele took place in the midst of their investigation of the assault on Officer Wiedefeld.
Officer Nasr was called as a witness by counsel for the Bamideles. He testified that he was drinking at Clyde’s restaurant but not at Szechuan, that he only ate at Szechuan, and that “shortly after” he “attempted to confront [the] individuals [at the adjacent table] concerning the sexual assault on Officer Wiedefeld,” he “had to turn [his] attention to Mr. Bamidele who approached in a hostile manner.” Officer Nasr “was trying to calm him, let him know we were handling the situation.” Officer Nasr was “approached with a secondary threat, ... Mr. Bamidele coming up with his fists balled. He [wa]s visibly angry.” Mr. Bamidele indicated that “he was angry, felt like he was disrespected.” Officer Nasr “tried to calm him down,” saying, “listen, we’re going to handle this.” They were in “tight quarters” in the Szechuan and soméone pushed Officer Nasr from behind toward Mr. Bamidele, whereupon Mr. Bamidele “lunge[d] to the bar and grab[bed] [a] wine glass,” and [h]e swung that wine glass.” At some point the glass broke and Officer Nasr felt that Mr. Bamidele had “an edged weapon,” and that he (Officer Nasr) had been “trained to *529 take action.” As Officer Nasr put it, “when you have somebody pull a weapon, you have to react to that and ... I was able to get []hold of Mr. Bamidele, stop him from causing any injury — further injury to anybody else — any other civilians that would have been in the restaurant until he dropped that glass.” Officer Nasr asserted that he received a contusion to his forehead during the encounter with Mr. Bamidele.
Later during trial, Officer Nasr was called again and he testified on behalf of the defendant officers. Before repeating his description of Mr. Bamidele’s approach, he testified that when Officer Wie-defeld returned to the officers’ table from the bathroom and said she had just been grabbed, “she was pretty upset” and her face was “flush.” She pointed out the men at the adjacent table. While the officers “were trying to figure out what had happened,” the men at the adjacent table started to throw food in the direction of the officers. Officers Callahan, Wiedefeld, and Nasr “g[o]t up ... to ... confront [the men][,] ... identify them and take police action.” As Officer Nasr put it, “she was the victim and she was there, so we had to go identify the suspect and possibly place him under arrest.” Officers Callahan and Wiedefeld were beside Officer Nasr. Upon seeing Mr. Bamidele, Officer Nasr turned to try to calm him and to “let him know this wasn’t about him, that we would handle it.” The men at the adjacent table were “cursing at [the officers and] yelling.” Officer Nasr “notice[d] [that] Mr. Bamidele [was] visibly upset.” He repeated his earlier testimony about his interaction with Mr. Bamidele.
Officer Callahan was called as a witness for the Bamideles. During cross-examination by the officers’ defense counsel, he stated that while he “was talking to Officer Wiedefeld trying to figure out what happened, [he] g[o]t hit in the face with a piece of broccoli.” That “shocked” him and he took the saucer from underneath his tea cup and “smashed it on the table out of frustration.” “Immediately” after that he got up and approached the men at the table from which the broccoli was thrown. His intent was “to confront [the men] about the assault and to detain them.” He identified himself and Officer Wiedefeld as police officers. One of the men pushed him in the chest and he in turn pushed the man and they got into “a little wrestling match.” He did not see Mr. Bamidele at that time, and “maybe 20 minutes later” he saw Mr. Bamidele in the bathroom; Officer Callahan told him he was “sorry about what happened,” referring to his (Officer Callahan’s) altercation with the unidentified men. He never saw anyone punch Mr. Bamidele, and he did not strike Mr. Bamidele.
Mr. Bamidele testified that he and his wife sat at a table for two at the Szechuan, another table for two was next to their table, and a round table at which the officers (at that point he did not know they were officers) sat was behind him. He saw Officer Wiedefeld going back and forth between the table next to his and the round table. After the broccoli and plate were thrown near Mr. Bamidele and his wife, Mr. Bamidele asked for and paid his check, and he and his wife walked between the round table and the table next to the one at which they had been seated. Mr. Bamidele observed that Officer Callahan was drunk. Mr. Bamidele informed Officer Callahan that he almost hit his wife. Officer Callahan punched Mr. Bamidele in the face and Officer Nasr cursed and hit Mr. Bamidele. Officer Wiedefeld “used her elbow across [Mr. Bamidele’s] neck [and] pressed [him] against the wall.” According to Mr. Bamidele, Officer Anderson (sic) came into the Szechuan, saw what the officers were doing, and called the officers *530 by name. Mr. Bamidele denied grabbing a wine glass. He saw Officer Callahan in the bathroom later while he (Mr. Bami-dele) “was washing all the dust and ... all the scratches off [his] hands.” Officer Callahan said he was sorry. Officer Phillip Henderson was on duty when a citizen informed him of an incident or dispute at the Szechuan. Upon entering the restaurant he saw Officers Callahan and Wiede-feld holding Mr. Bamidele against the wall. The restaurant “was a mess” with “tables turned ■ over, ... plates of food on the floor,” and “a plate ... stuck in the wall of the restaurant.”
Reasonable jurors could make credibility determinations based on the aforementioned testimony. In addition, the jurors could reasonably infer and conclude that Officers Callahan, Wiedefeld, and Nasr expressed an intent to take police action at the Szechuan relating to the assault against Officer Wiedefeld, and further, that at least Officer Nasr (with a reasonable inference that he was assisted by Officers Callahan and Wiedefeld) engaged in police action against Mr. Bamidele purportedly to assure him that he and the others could handle the sexual assault investigation, and to prevent injury to the officers or others at the Szechuan.
Given the cited testimony, I cannot agree with the majority opinion that Officers Callahan, Wiedefeld, and Nasr only engaged in a “purely personal venture,” or were motivated “solely by personal reasons.” See District of Columbia v. Coron, 515 A.2d 435, 438 (D.C.1986) (off duty officer who had been drinking almost hit a pedestrian twice and when the pedestrian kicked at his car, the officer and a fellow off duty officer jumped out of the car, knocked the pedestrian and repeatedly hit him in the face and stomach; as a matter of law the officers were not acting within the scope of their employment). As articulated in two of this court’s early cases, by which this court is bound, to be outside the scope of employment, the employees’ actions must be “entirely disconnected from the work of the master, or the actions could only be characterized as a “personal mischievous whim,” or the actions were done “solely for the accomplishment of the independent ... mischievous purpose of the servant.” Great A & P Tea Co. v. Aveilhe, 116 A.2d 162, 165-66 (D.C.1955) (jury could not reasonably infer that a “series of events consisting of two clerks conversing, laughing, and one pulling upon the other causing him to fall into a by-standing customer, could be of any benefit to their employer or in furtherance of the duties assigned to them”). Unlike the factual context in Coron and Aveilhe, reasonable jurors could infer and conclude that Officers Callahan, Wiedefeld and Nasr were not engaged in a “purely personal venture,” or that their actions were not “entirely disconnected from the work of the [District].” Id. Rather, they were motivated “at least in part by an intent to further [MPD’s] business” by investigating an alleged assault and precluding another patron of the Szechuan not only from interfering with the investigation but also from causing injury to the officers or others at the Szechuan; and hence, thé injuries to the Bamideles were “the outgrowth of ... action undertaken in the employer’s behalf.” Boykin, supra, 484 A.2d at 563-64 (D.C.1984).
Because I believe that the officers acted at least in part in furtherance of MPD’s business, I must reach the District’s threshold and main argument that it is “entitled to judgment because plaintiffs failed to comply with the notice-of-claim requirements of D.C.Code § 12-309.” The notice statute provides that “within six months after the injury or damage was sustained, the claimant, his agent or attorney” must “give[ ] notice in writing to the *531 Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.” D.C.Code § 12-309 (2012 Repl.); see also Washington v. District of Columbia, 429 A.2d 1362, 1365 (D.C.1981) (purpose of notice is to give the District an opportunity to ascertain the facts and to adjust the claim). The statute also specifies that: “A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.” D.C.Code § 12-309. However, police reports must contain the same information, with “the same degree of specificity,” required for any other form of notice. Pitts v. District of Columbia, 391 A.2d 803, 808 (D.C.1978) (quoting Jenkins v. District of Columbia, 379 A.2d 1177, 1178 (D.C.1977)).
Nevertheless, “section 12-309 does not require ‘precise exactness’ with respect to the details of the police reports.” Doe by Fein v. District of Columbia, 697 A.2d 23, 28 (D.C.1997) (internal quotation marks and citation omitted) (citing Washington, supra, 429 A.2d at 1365). Moreover, notice need not be in the form of a single, authoritative record; plaintiffs may piece together adequate notice using multiple documents. See Enders v. District of Columbia, 4 A.3d 457, 468 (D.C.2010); Jones v. District of Columbia, 879 F.Supp.2d 69, 78 (D.D.C.2012). Thus, a police report “provides sufficient notice of the ‘cause’ of an injury to satisfy the statutory requirement, if it recites facts from which it could be reasonably anticipated that a claim against the District might arise.” Pitts, supra, 391 A.2d at 809 (citation omitted).
In essence, the notice question raised by the District requires focus on whether any of the three reports of the February 3, 2007, incident, compiled by MPD personnel, gave the District notice that it could reasonably anticipate a vicarious liability claim against the District by the Bami-deles. I conclude that the February 3, 2007, police incident-based report, filed on the same day by MPD Officer Phillip Henderson, who responded to the scene, standing alone, did not provide adequate notice under D.C.Code § 12-309, that the District might be vicariously liable for injury to the Bamideles due to actions of its employees while acting within the scope of their employment. The only person named in that report was Michael Callahan, but he was not identified as a police officer. While Ms. Bamidele declared in her accompanying statement that as many as five additional assailants were involved, she did not specify that any of these individuals were District employees.
Subsequently, however, MPD’s Office of Internal Affairs (“OIA”) produced two reports about the February 3 incident. In my view, the February 3 incident-based report, combined with the OIA reports, dated February 20 and April 25, 2007, provided adequate notice that the District might be vicariously liable for the assault on Mr. Bamidele by its employees (Officers Callahan, Wiedefeld, and Nasr) because by Officer Callahan’s identification of himself and Officer Wiedefeld as police officers after the assault on Officer Wiede-feld and by all three officers expressing an intent to take police action, they were acting within the scope of their employment at the Szechuan. The OIA reports, unlike the incident-based report, unambiguously identified the individuals who assaulted Mr. Bamidele as MPD officers. Moreover, the April 25 report stated: “[Mr. Bami-dele] alleged that Officer ... Callahan, ... assisted by Officers ... Nasr and ... Wiedefeld, assaulted him.” The report also contains details suggesting that these officers were acting in the scope of their employment. Officer Callahan told the internal affairs investigator that he displayed his badge when he confronted the three unidentified men in the Szechuan *532 restaurant after the alleged assault on Officer Wiedefeld. Officer Wiedefeld “stated that Officer Callahan spoke for the [officers and] advis[ed] [the unidentified men] that they were ‘Cops.’ ” The accounts of all the officers reveal that they were responding to an assault on Officer Wiedefeld or acting to prevent injury by a restaurant patron to others in the restaurant, actions for which they had a legal duty to respond. See D.C.Code § 5-115.03 (2008) (making it a misdemeanor for any officer to “neglect making any arrest for an offense ... committed in his presence”).
While these reports do not fully describe the Bamideles’ injuries or explicitly indicate that they planned to bring claims against the District, § 12-809 does not require such exacting specificity. It is true that, because the statute abrogates the District’s common-law tort immunity, we interpret it strictly. Pitts, supra, 391 A.2d at 807. But in regard to the “details” of a plaintiffs notice, we have taken a more forgiving approach, stating that “[p]recise exactness is not absolutely essential.” Id. (quoting Hurd v. District of Columbia, 106 A.2d 702, 705 (D.C.1954)). To satisfy the statute, the combined MPD reports need not have “fully reflected] every salient fact concerning the potential liability of the District with the same degree of clarity and specificity as a document drawn by an attorney.” Id. at 809. Rather, they need only have “recit[ed] facts from which it could be reasonably anticipated that a claim against the District might arise.” Id. I believe that these reports notified the District that it could be vicariously liable for the actions of the three police officers.[1]
I distinguish this case from Doe by Fein, in which we found that the plaintiff failed to notify the District of facts from which it could reasonably anticipate that its own liability might arise. Doe by Fein, supra, 697 A.3d at 31. Unlike the situation in that case, the OIA investigative reports in this case are police reports, and they were made “in regular course of duty,” as § 12-309 requires. Id. Furthermore, the Bami-deles did not assert any direct liability theory against the District; their sole theory was respondeat superior. In my view, Gaskins v. District of Columbia Hous. Auth., 904 A.2d 360 (D.C.2006), also is distinguishable. Here, unlike Gaskins, the collective OIA and incident-based reports, all of which constitute police reports, not only specified the cause of the Bamideles injury — the assault by Officers Callahan, Nasr, and Wiedefeld — but they also recited facts that provided reasonable notice to the District that it could be vicariously liable because the officers may have caused the Bamideles’ injuries while acting within the scope of their employment. Furthermore, contrary to the District’s argument that the OIA reports do not qualify as police reports “in regular course of duty,” and that only contemporaneous, incident-based reports fall within the statutory exception, the United States District Court for the. District of Columbia, has ruled consistently, at least since 1986, that reports generated by MPD’s Internal Affairs Division “are reports created in the regular course of duty.” Jones, supra, 879 F.Supp.2d at 80 (citing Shaw v. District of Columbia, No. 5-CV-1284, 2006 WL 1274765, at *12 (D.D.C. May 8, 2006)). Here, MPD completed both of its OIA reports well before the expiration of the *533 six month time frame set forth in § 12-309, and in my view, the February 3 incident-based report, combined with the OIA reports, provided sufficient notice of “the approximate time, place, cause, and circumstances of the injury or damage.” D.C.Code § 12-309. In short, the combined MPD reports constitute the type of “full detailed official report[s],” reflecting “an immediate and thorough investigation” of the incident, that we have said serve D.C.Code § 12-309’s statutory purpose. Pitts, supra, 391 A.2d at 808 (quoting Thomas v. Potomac Elec. Power Co., 266 F.Supp. 687, 694 (D.D.C.1967)).
In sum, I would deny the District’s motions for judgment as a matter of law, as they related to the District’s vicarious liability for the compensatory damages the jury awarded against the officers. I would also deny the motions because I believe the record reflects that the Bamideles met the notice requirements of D.C.Code § 12-309.

. The District argues that, even if the OIA reports provided notice of Mr. Bamidele’s potential claim, they did not mention any injury to Ms. Bamidele. I disagree. Both the February 20 and April 25 reports indicate that Officer Callahan threw a plate, which almost struck Ms. Bamidele. Moreover, both reports clearly indicate that Ms. Bamidele was present during the assault and witnessed the officers beating her husband.